# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J.  Fisher, Jr.                                    Elisabeth A. Shumaker
Clerk                                                      Chief Deputy Clerk

July 14, 1997


**TO:**   All recipients of the captioned opinion

**RE:**   96-1259, USA v. Castillo-Garcia
          June 30, 1997


Please be advised of the following correction to the captioned decision:

There is a typographical error on page 35 of the opinion.  In the second sentence of the paragraph beginning "This fact, . . ." the phrase "had ever been tried" should be "had even been tried."

Please make the correction.

                              Very truly yours,

                              Patrick Fisher, Clerk


                              Susie Tidwell
                              Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 30 1997**

**PATRICK FISHER**
**Clerk**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

CEFERINO CASTILLO-GARCIA, also
known as Pini, JESUS SAUL
BUJANDA-IBARRA, ISMAEL
ARMENDARIZ-AMAYA, VICTOR
JULIA AVILA, Jr., LARRY PINO,
APOLONIO PORTILLO-
RODRIGUEZ, ALONSO MORENO,
THOMAS McCULLOCH, ALBERTO
AVILA, also known as Jesus Javalera,
JACK GIRARD, also known as Jacko,
JOANNE AYERS, and JAIME
OLIVAS-SANCHEZ,

     Defendants-Appellees,

and

JEFFERY SAMUEL PINO, RAY
GUTIERREZ, also known as Guero,
DOUG TIERNEY, JOHN SHERIDAN,
and MATT HILTON,

     Defendants.

No. 96-1259

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 94-CR-371-ALL)**

---

John M. Hutchins, Assistant United States Attorney, Denver, CO, argued the cause for the appellant.  Henry L. Solano, United States Attorney, Denver, CO, and David M. Gaouette, Assistant United States Attorney, Denver, CO, assisted on the brief.

Virginia Grady, Assistant Federal Public Defender, Denver, CO, argued the cause for appellee Ismael Armendariz-Amaya.  Michael G. Katz, Federal Public Defender, Denver, CO, assisted on the brief.

Harvey A. Steinberg, Denver, CO, argued the cause for appellee Jesus Saul Bujanda-Ibarra.  Susan Fuller, Denver, CO, assisted on the brief.

Argued March 18, 1997.

---

Before **PORFILIO, EBEL,** and **HENRY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

After obtaining and executing five separate but related telephone wiretapping orders, the government secured evidence sufficient to indict eighteen members of an alleged drug conspiracy.  In a pre-trial order, however, the district court suppressed all evidence obtained pursuant to four of the five wiretapping orders, on the grounds that the government had not demonstrated sufficient "necessity" for those wiretaps.  Pursuant to 18 U.S.C. § 2518(10)(b) (1994), the government now appeals the district court's suppression order.  We exercise jurisdiction under 18 U.S.C. § 3731 (1994), affirm in part, and reverse in part.

**BACKGROUND**

During the summer of 1994, Denver Police detective Stephen F. Barnhill (working as a special federal officer "deputized" by the FBI) was told by a confidential informant that Rosario Portillo-Rodriguez[1] was running a large cocaine distribution operation out of two houses located on Raritan Street in Denver. United States v. Castillo-Garcia, 920 F. Supp. 1537, 1541 (D. Colo. 1996). The confidential informant claimed to have obtained 22 kilograms (almost 50 pounds) of cocaine from Rosario Portillo-Rodriguez over the past year. Detective Barnhill impounded 1.25 of those kilograms.

Based on that information, and after a month of collecting additional evidence against Rosario Portillo-Rodriguez, Detective Barnhill applied for a warrant to wiretap three phone numbers assigned to Rosario Portillo-Rodriguez's home telephone, cellular telephone, and pager. The application noted certain difficulties which had thwarted the government's attempts to conduct visual surveillance of Rosario Portillo-Rodriguez and the Raritan Street houses. Specifically, the application alleged that one of the Raritan Street houses was set too far back from the street to be observed, that the residential nature of the Raritan Street neighborhood rendered surveillance officers conspicuous, and that it was difficult to tail Rosario Portillo-Rodriguez because he owned and drove nine different vehicles and frequently went to construction sites located in remote

_____

[1]Rosario Portillo-Rodriguez is *not* a defendant in the present proceeding.

locations with limited traffic access. In addition, the application documented a fruitless year-long attempt by a confidential informant to determine the ultimate source of Rosario Portillo-Rodriguez's drugs. Finally, the application enumerated certain reasons, discussed Part III, *infra*, why other normal investigative techniques would be unlikely to succeed if tried. On August 19, 1994, United States District Judge Sparr issued a warrant authorizing interceptions of communications from these three phone numbers [the "First Wiretap"]. The First Wiretap began immediately, and terminated on September 17, 1994.

During the period from August 19, 1994, to September 17, 1994, by eavesdropping on calls to and from Rosario Portillo-Rodriguez's home telephone, cellular telephone, and pager, the FBI learned the identities of several other suspected members of Rosario Portillo-Rodriguez's suspected cocaine distribution operation. Equipped with this information, the government began visually surveilling at least one of Rosario Portillo-Rodriguez's suspected drug suppliers: defendant-appellee Ceferino Castillo-Garcia. On September 5, 1994, however, Ceferino Castillo-Garcia phoned Rosario Portillo-Rodriguez and told him that he "saw them watching."

Subsequently, on September 22, 1994, the government applied for a warrant to wiretap two more telephone numbers: one subscribed to in the name of Fidela Armendariz, and one subscribed to in the name of Anita Pino. Neither of these

two individuals, however, were targets of the government's investigation. Rather, the government sought these wiretaps because Ceferino Castillo-Garcia had on several occasions placed drug-related "business" calls to Rosario Portillo-Rodriguez from each of the two targeted phone numbers.[2] In response to this application, Judge Sparr issued Warrant 94-WT-7, authorizing electronic eavesdropping on phone numbers (303) 431-4345 and (303) 292-1131 [the "Second Wiretap"].

Also on September 22, 1994, the government applied for a warrant to wiretap two phone numbers assigned to digital paging devices. One pager was subscribed to in the name of Ruben Martinez; the other in the name of Raul Ferrnandez. Once again, neither of these two individuals were the targets of the government's investigation. Rather, the government sought to wiretap the "Ruben Martinez" pager because it overheard Ceferino Castillo-Garcia (phoning from Juarez, Mexico) instruct Rosario Portillo-Rodriguez to "take down the 'beeper number' in case an opportunity arises," and then provide the pager number assigned to Ruben Martinez. The government understood this instruction to mean that Rosario Portillo-Rodriguez should page Ceferino Castillo-Garcia at Ruben Martinez's pager number if Rosario Portillo-Rodriguez wanted any more cocaine

---

[2]The government was able to determine the phone numbers from which Ceferino Castillo-Garcia's calls were placed by consulting "trap and trace records" for Rosario Portillo-Rodriguez's wiretapped phone number.

or marijuana while Ceferino Castillo-Garcia remained in Mexico. The government sought to wiretap the "Raul Ferrnandez" pager because, on several occasions, Rosario Portillo-Rodriguez left messages on that pager requesting return phone calls. The government suspected that Rosario Portillo-Rodriguez and Jaime Olivas-Sanchez (a suspected intermediary between Rosario Portillo-Rodriguez and other sources of cocaine and marijuana) were using the "Raul Ferrnandez" pager. In response to this application, Judge Sparr issued Warrant 94-WT-8, authorizing electronic eavesdropping on phone numbers (303) 251-1594 and (303) 609-1931 [the "Third Wiretap"].

On October 7, 1994, the government applied for a warrant to wiretap Ceferino Castillo-Garcia's home telephone number. In the application, the government presented evidence that both Ceferino Castillo-Garcia and Ismael Armendariz-Amaya had made drug-related "business" calls from this number. In response to this application, Judge Sparr issued Warrant 94-WT-10, authorizing electronic eavesdropping on phone number (303) 477-2721 [the "Fourth Wiretap"].

Finally, on October 21, 1994, the government applied for a warrant to wiretap a telephone number subscribed to in the name of "M. Olivas." In the application, the government presented evidence that Jaime Olivas-Sanchez had, on several occasions, phoned Rosario Portillo-Rodriguez from the "M. Olivas"

phone number to discuss several drug purchases which Jaime Olivas-Sanchez was attempting to broker for Rosario Portillo-Rodriguez. In response to this application, Judge Sparr issued Warrant 94-WT-11, authorizing electronic eavesdropping on phone number (303) 937-1365 [the "Fifth Wiretap"].

During September and October, 1994, the "Second through Fifth Wiretaps" were all executed. Castillo-Garcia, 920 F. Supp. at 1542-43. All wiretapping was completed by October 30, 1994, by which time about 3500 telephone conversations had been intercepted. United States v. Castillo-Garcia, No. 94-CR-371, slip op. at 2 (D. Colo. May 23, 1996) (unpublished order & mem.).

Based largely on information obtained through the five wiretaps, indictments were brought against eighteen named defendants on eight counts. Castillo-Garcia, 920 F. Supp. at 1540. A group of these defendants--*not* including original target Rosario Portillo-Rodriguez--moved to suppress the wiretap evidence, on the grounds that the government had not demonstrated the "necessity" for the wiretaps required by 18 U.S.C. § 2518(1)(c) (1994). On March 25, 1996, U.S. District Judge Nottingham, who had not issued any of the warrants, granted the defendants' motion to suppress the evidence obtained pursuant to the Second through Fifth Wiretaps. Id. at 1548-52. Judge Nottingham denied the motion to suppress evidence obtained pursuant to the First Wiretap. Id. at 1547-48.

The government then moved for reconsideration, arguing that even if there was no "necessity" for the Second through Fifth Wiretaps, the evidence obtained from those wiretaps should not be suppressed because, in executing the wiretaps, the FBI relied in good faith on a facially valid warrant issued by U.S. District Judge Sparr. See United States v. Castillo-Garcia, No. 94-CR-371, slip op. at 4, 5 (D. Colo. May 23, 1996) (unpublished order & mem.).

Judge Nottingham denied the government's motion for reconsideration, noting that the government had not raised the "good faith exception" issue in the initial proceeding. United States v. Castillo-Garcia, No. 94-CR-371, slip op. at 5-8 (D. Colo. May 23, 1996) (unpublished order & mem.). In *dicta*, however, Judge Nottingham opined both that the "good faith exception" to the exclusionary rule does not apply to statutory wiretap situations, id. at 8-13, and that even if it did, the FBI did not act in good faith here. Id. at 13. Thus, Judge Nottingham affirmed his original order suppressing the evidence obtained from the Second through Fifth Wiretaps. Id. at 21.

The government now appeals the suppression of the evidence obtained from the Second through Fifth Wiretaps.

**DISCUSSION**

I.

In its published opinion in the present case, the district court provided a concise overview of the legal framework for FBI wiretapping. As the court explained:

> Electronic eavesdropping by law enforcement officials is governed by the federal wiretap statute, title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended. [18 U.S.C. §§ 2510-22 (1994 & Supp. 1996)]. To assure the privacy of oral and wire communications, title III establishes a three-tiered procedure for obtaining authorization to intercept wire or oral communications. First, a duly-authorized law enforcement officer must obtain approval from the Attorney General of the United States or a specially designated assistant attorney general in order to apply to a federal judge for a wiretap. See 18 U.S.C. § 2516(1) (1994). Second, once such approval is obtained, the officer must present a written application for a wiretap to the judge. Third, the judge must make certain enumerated findings and issue an *ex parte* order containing specified elements. See 18 U.S.C. § 2518(1), (3)-(4) (1994). Strict adherence to these procedural steps is a prerequisite to issuance of a wiretap order.

United States v. Castillo-Garcia, 920 F. Supp. 1537, 1543 (D. Colo. 1996).

In the present case, the government complied with all three of these procedural steps. Further, it is now uncontested that the government demonstrated "probable cause" sufficient to support all five warrants issued by Judge Sparr. As the district court noted, however, Title III contains a "necessity" requirement--separate and distinct from its "probable cause" requirement--which must be satisfied before a wiretap order may be lawfully issued. Id. at 1544 (citing 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994)). The purpose of the "necessity" requirement is "to ensure that the relatively intrusive device of

wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)). Pursuant to this "necessity" requirement:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication . . . shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c) (1994).

Furthermore, before issuing a wiretap order, a district judge must independently determine that the requested wiretap is necessary. United States v. Mondragon, 52 F.3d 291, 293 (10th Cir. 1995). Specifically, the judge must be convinced, *inter alia*, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) (1994). If the requirements of 18 U.S.C. § 2518(1)(c) (1994) and 18 U.S.C. § 2518(3)(c) (1994) are not each met, no warrant should issue. In any event, evidence obtained in violation of 18 U.S.C. § 2518(1)(c) (1994) or 18 U.S.C. § 2518(3)(c) (1994) must be suppressed. See 18 U.S.C. § 2515 (1994) ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence

- 10 -

derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter.").

In the present case, Judge Nottingham found no fault with the issuance of the First Wiretap order. However, after noting that 18 U.S.C. § 2518(1)(c) (1994) requires in "*each* application . . . 'a full and complete statement' concerning the efficacy of other investigative procedures," Castillo-Garcia, 920 F. Supp. at 1545 (emphasis in original), Judge Nottingham found that the "necessity requirement" was not met with respect to the Second through Fifth Wiretap orders issued by Judge Sparr. In particular, Judge Nottingham observed that entire paragraphs of affidavits attached to the warrant applications "consist of 'boilerplate' language which does not vary from one affidavit to the next." United States v. Castillo-Garcia, 920 F. Supp. 1537, 1543 (D. Colo. 1996); see also id. at 1554-65 (reprinting pertinent language from warrant applications).

Judge Nottingham further found, as a factual matter, that:

> [t]he apparent reason for this identity was . . . [that] the United States never paused to give further renewed consideration to the efficacy of . . . normal investigative procedures, . . . and it never really tried to use any of these procedures. Instead, the investigation proceeded from one wiretap to another.

Id. at 1543. Pursuant to 18 U.S.C. § 2515 (1994), Judge Nottingham therefore suppressed all evidence obtained from those Wiretaps.

The government now argues that Judge Nottingham applied too stringent a test of "necessity" under 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994).

## II.

On appeal from a motion to suppress evidence obtained pursuant to a wiretap, we accept the district court's factual findings unless clearly erroneous, review questions of law *de novo*, and view the evidence in the light most favorable to the prevailing party. United States v. Edwards, 69 F.3d 419, 428 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996) (citing United States v. Williamson, 1 F.3d 1134, 1135 (10th Cir.1993)). The question of whether the government demonstrated sufficient "necessity" under 18 U.S.C. § 2518(1)(c) (1994) to support the issuance of a wiretapping order is a question of law which we review *de novo*.[3] United States v. Quintana, 70 F.3d 1167, 1169 (10th Cir. 1995). However, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." Id. Thus, under our precedents, the defendants continue to carry the burden of persuasion on the

---

[3]Because the application of the "necessity" requirement is a question of law subject to *de novo* review, we note that Judge Nottingham, who found insufficient "necessity" to support the Second through Fifth wiretapping orders, owed no deference to Judge Sparr, who had found sufficient "necessity" to issue those orders. Similarly, we owe no deference to either Judge Nottingham or Judge Sparr in assessing whether the Second through Fifth Wiretaps were "necessary."

legal question of whether the Second through Fifth Wiretaps were "necessary," despite having prevailed below.[4] As discussed *supra* Part I, a wiretap is "necessary" only where "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994).

As the district court noted, Congress did not intend the statutory phrase "normal investigative procedures" to include electronic eavesdropping techniques. Castillo-Garcia, 920 F. Supp. at 1545 (citing United States v. Bianco, 998 F.2d 1112, 1127 (2d Cir. 1993), cert. denied, 511 U.S. 1069 (1994); United States v. Uribe, 890 F.2d 554, 556 (1st Cir. 1989); United States v. Lambert, 771 F.2d 83, 91 (6th Cir.), cert. denied, 474 U.S. 1034 (1985)). Rather, the Ninetieth Congress, which enacted Title III, envisioned that

> [n]ormal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

---

[4]As discussed *supra*, however, we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the defendants, who prevailed below. United States v. Edwards, 69 F.3d 419, 428 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996) (citing United States v. Williamson, 1 F.3d 1134, 1135 (10th Cir.1993)). Thus, the defendants are in a somewhat better position than if they had not prevailed below.

Senate Comm. on the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 90-1097, at 79 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190, and cited in Castillo-Garcia, 920 F. Supp. at 1545; see also United States v. Mesa-Rincon, 911 F.2d 1433, 1444 (10th Cir. 1990) (relying on above-quoted Senate Report language to require the government to exhaust these four investigative techniques or to explain why exhaustion would be too dangerous or futile, prior to initiating electronic *visual* surveillance).

The Ninetieth Congress noted that "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." Id. (citing Giancana v. United States, 352 F.2d 921 (7th Cir.), cert. denied, 382 U.S. 959 (1965); People v. Saperstein, 140 N.E.2d 252 (N.Y. 1957), cert. denied, 353 U.S. 946 (1957)). It therefore emphasized that "[w]hat the provision envisions is that the [government's] showing [of necessity] be tested in a practical and commonsense fashion." Id. (distinguishing United States v. Ventresca, 380 U.S. 102 (1965)).[5] In this fashion, a court must undertake "a consideration of all the facts and circumstances" in order to determine whether the government's showing of necessity is sufficient to justify a wiretap. Id.

---

[5]This court has always adhered to Congress's intention that the government's demonstration of the necessity for instituting a wiretap be evaluated in a practical and commonsense fashion. See, e.g., United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir.), cert. denied, 493 U.S. 981 (1989); United States v. Johnson, 645 F.2d 865, 867 (10th Cir.), cert. denied, 454 U.S. 866 (1981).

The "necessity" requirement of Title III is not an "exhaustion" requirement. "In examining necessity challenges to wiretap orders, we have repeatedly held that law enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996) (internal quote marks and citations omitted). "Rather, that section of the statute serves to insure that wiretapping is not used in situations where traditional investigative techniques would suffice to expose the crime." United States v. Johnson, 645 F.2d 865, 867 (10th Cir.), cert. denied, 454 U.S. 866 (1981) (citing cases). Thus, the government may obtain a wiretapping warrant without trying *any* other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try. See 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994); United States v. Mesa-Rincon, 911 F.2d 1433, 1444 (10th Cir. 1990).[6]

In Mesa-Rincon, we noted that "[t]he legislative history of Title III suggests . . . [reasonable investigatory] techniques that *should* be considered,"

_____

[6]Although Mesa-Rincon involved visual, rather than aural, electronic surveillance, the Mesa-Rincon court adopted a "necessity" requirement for the government's use of clandestine television cameras by analogizing to the very provisions of Title III at issue here. See Mesa-Rincon, 911 F.2d at 1442-43. The Mesa-Rincon court predicated its analysis primarily on case law pertaining to wiretapping, and on the same legislative history materials applicable to the present case. See id. at 1442-45.

- 15 -

911 F.2d at 1444 (emphasis added), and we then identified the four investigative techniques specifically set forth by Congress in the Senate and House Report of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Id. (citing S. Rep. No. 90-1097, at 101[7] (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190).

We now expressly hold what the court in Mesa-Rincon suggested and what seems clearly to be contemplated by Title III. To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to

---

[7]Although the Mesa-Rincon court cited this quotation to page 101, the quoted language actually appears at page 79 of S. Rep. No. 90-1097 (1968).

why they also would be unsuccessful or too dangerous. We add pen registers and trap and trace devices to this list because they possess a logical relationship and close affinity to wiretaps and yet are less intrusive. Thus, unless the government can show that they would be ineffective or dangerous they must be tried before resorting to wiretaps.

Whether other normal investigative techniques must also be explored before turning to wiretaps will depend on the unique circumstances of each investigation. For example, it will often be the case that the government must consider first the less intrusive technique of reviewing available public, private, or governmental records pertaining to the suspects under investigation to see if the requisite information needed to prosecute may be obtained in that way. However, we articulate no general rule as to such other normal investigative techniques because they are so dependent upon the nature of the investigation and the crimes being investigated. Because the record in this case does not suggest to us any normal investigative techniques other than those cited by Congress in the Senate and House Report, plus pen registers, trap and trace devices, and telephone toll records, we confine our analysis to those techniques.

In any event, generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by

the wiretap.  The district court here rejected "boilerplate" allegations contained in some of the applications and as we discuss in Part III, *infra*, we agree with its concerns in certain regards.

However, the government need not exhaust or explain its failure to exhaust every *conceivable* investigative procedure before resorting to wiretapping.  Mesa-Rincon, 911 F.2d at 1444 (citing United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903 (1987)).  "Instead, we require the government to prove exhaustion--either by attempt or explanation of why the method would not work--of all 'reasonable' investigatory methods."  Id.

Additionally, we note that where the government's stated explanation for its use, or failure to use, normal investigative techniques clearly encompasses each of these categories and any other normal investigative techniques that may be applicable to the circumstances, it is not necessary for the government formally to address each category with an explanation.  Mesa-Rincon, 911 F.2d at 1444. Thus, the government's failure explicitly to explain its failure to utilize one or more specified categories of normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable.  See id. at 1445.

With these standards in mind, we proceed to analyze the five wiretap applications at issue in the present case.

### III.

As a threshold matter, we note that the district court denied the defendants' motion to suppress evidence obtained via the First Wiretap (94-WT-4), and that this decision has not been appealed. Nonetheless, because the Second through Fifth Wiretap incorporate by reference the application for the First Wiretap, we need to address it as well.

As discussed Part II, *supra*, we analyze each of the five wiretap applications to determine whether "each application" contained "a full and complete statement" demonstrating that (1) standard visual or aural surveillance; (2) general questioning or interrogation under an immunity grant; (3) use of regular search warrants; and (4) the infiltration of conspiratorial groups by undercover agents or informants, *each* "have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). We also examine whether pen registers, trap and trace devices, and review of telephone toll records were utilized. This showing must be made with respect to the target of each proposed wiretap, and must be stated with particularity.

**First Wiretap (94-WT-4) (8/19/94)**:

The district court found that the government's application for the First Wiretap satisfied the requirements of 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). Castillo-Garcia, 920 F. Supp. at 1547-48. We agree. The First Wiretap was directed at three phone numbers used by Rosario Portillo-Rodriguez, who was suspected of directing his organization's drug distribution operations in Denver. The government sought the wiretap in order to determine the source of Rosario Portillo-Rodriguez's drugs.

As the government explained in its application, standard visual and aural surveillance of Rosario Portillo-Rodriguez's suspected drug distribution operation had been tried, but had failed due to the location of Rosario Portillo-Rodriguez's Raritan Street houses and garage in a quiet residential neighborhood, at a curve in the road, and set back from the street behind another house. Id. at 1548. The government had also attempted visual surveillance of Rosario Portillo-Rodriguez's activities outside the Raritan street houses, but these attempts had failed to adduce any evidence because Rosario Portillo-Rodriguez frequented construction sites located in remote locations with limited traffic access, and drove nine different vehicles as a result of his connection with construction work. Id.

Further, the government had tried using a confidential informant to discover the source of Rosario Portillo-Rodriguez's drug supply. Id. at 1547. However, that confidential informant had purchased more than twenty kilograms of cocaine from Rosario Portillo-Rodriguez over the course of a year, but had never been introduced to Rosario Portillo-Rodriguez's suppliers. Id. The government thus reasonably concluded that the attempted use of a confidential informant to discover Rosario Portillo-Rodriguez's suppliers had failed, and that the use of an undercover law enforcement officer for the same purpose would be no more likely to succeed. Id.

In addition, the government had used trap and trace devices and pen register data and had reviewed telephone toll records from Rosario Portillo-Rodriguez's three phone numbers. Id. at 1556 ¶ 40. However, after employing these techniques for about a month, the government had still not discovered the source of Rosario Portillo-Rodriguez's drug supply. Id. at 1541, 1556 ¶ 40. The government explained that these techniques had proven ineffective because they did not enable the government to identify the individuals placing the calls to Rosario Portillo-Rodriguez, nor did they reveal the nature or purpose of the communications. Id. at 1556 ¶ 40. This attempt satisfies the government's obligation in this investigation to try trap and trace devices, pen register data, and telephone toll records prior to resorting to wiretapping.

In its application, the government also explained that use of general questioning or interrogation under an immunity grant was unlikely to succeed if tried for four reasons: (1) no single person was familiar with the entire conspiracy; (2) the interviewees would fear likely reprisals; (3) word of such interviews might cause some subjects of the investigation (many of whom had strong ties with the Republic of Mexico) to flee the United States; and (4) because the government did not, as of August, 1994, know or suspect the identities of any of Rosario Portillo-Rodriguez's suppliers, culpable persons might receive grants of immunity which would make their subsequent prosecution difficult. Id. at 1548. We agree with the district court's conclusion that these assertions, accompanied by the specific and particularized information contained throughout the First Wiretap application, establish that the use of general questioning or interrogation under an immunity grant was unlikely to succeed if tried. Id.

Finally, the government explained that it eschewed the use of a regular search warrant at Rosario Portillo-Rodriguez's Raritan Street houses because it did not expect that a search of the houses would produce any uncoded written information which would identify the participants in Rosario Portillo-Rodriguez's cocaine distribution business. Id. at 1551. The district court was skeptical of the government's explanation, on the ground that the explanation ignored (and tended to contradict) specific information known to the government which suggested that

- 22 -

Rosario Portillo-Rodriguez did maintain "a record of his drug customers and outstanding debts in a small notebook." Id. We do not share the district court's skepticism in this regard. Rather, we see no contradiction between information suggesting that Rosario Portillo-Rodriguez maintained records of his drug *customers* and outstanding *debts*, and the government's hypothesis that Rosario Portillo-Rodriguez did not maintain records which would reveal the names of his drug *suppliers*. Our limited disagreement with the district court is immaterial, however, because we agree with the district court's ultimate conclusion--which was not appealed--that the government's application for the First Wiretap demonstrated sufficient necessity to justify the Wiretap.

**Second Wiretap (94-WT-7) (9/22/94; extended 10/21/94)**:

The district court found that the government's application for the Second Wiretap, in contrast to its application for the First Wiretap, failed to satisfy the requirements of 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). Castillo-Garcia, 920 F. Supp. at 1549-52. Reviewing this conclusion *de novo*, we disagree. The Second Wiretap was directed against two phone numbers used by Ceferino Castillo-Garcia,[8] who was suspected of being the intermediary between Rosario

_____

[8]As discussed in the BACKGROUND section, *supra*, neither of these phone numbers were subscribed to in Ceferino Castillo-Garcia's name. We consider the relevance of this fact, however, to be minimal. Before seeking to wiretap these two phone numbers, the government used trap and trace records to establish that

(continued...)

- 23 -

Portillo-Rodriguez and the ultimate source of the cocaine which Rosario Portillo-Rodriguez was distributing in Denver. The government sought the wiretap in order to determine where Ceferino Castillo-Garcia was obtaining his drug supply.

As the district court noted, the application for the Second Wiretap incorporated by reference the application for the First Wiretap. See Castillo-Garcia, 920 F. Supp. at 1557 ¶ 29. Pertinent to the "necessity" of wiretapping Ceferino Castillo-Garcia, the First Wiretap application stated that: (1) the government suspected Rosario Portillo-Rodriguez to be a member of a large drug conspiracy; (2) that some of Rosario Portillo-Rodriguez's suspected co-conspirators were from Mexico and several of them were related to each other, making penetration of the alleged conspiracy difficult; (3) that unindicted and at-large members of the conspiracy were unlikely to co-operate with the FBI if contacted; (4) that one confidential informant ("CW-1") working with the FBI could not penetrate the alleged conspiracy any further because CW-1 dealt only with Rosario Portillo-Rodriguez; (5) that pen registers and "trap and trace" devices, which identify telephone numbers called or called from, provided insufficient information as to the identities of people using those telephone

[8](...continued)
they were in fact being used by Ceferino Castillo-Garcia to discuss drug transactions with Rosario Portillo-Rodriguez. It does not appear that anyone other than Ceferino Castillo-Garcia was targeted by the Second Wiretap. Indeed, neither Fidela Armendariz nor Anita Pino, to whom the two phone numbers were registered, were ever charged in connection with the present case.

- 24 -

numbers and the substance of those conversations; and (6) that the alleged conspiracy operated on a 24-hour basis, rendering visual surveillance difficult and costly. Castillo-Garcia, 920 F. Supp. at 1555-56.

In addition to the information incorporated by reference from the First Wiretap application, the application for the Second Wiretap revealed three additional facts pertinent to the necessity of wiretapping Ceferino Castillo-Garcia. First, the Second Wiretap application disclosed that evidence adduced from the First Wiretap indicated that Ceferino Castillo-Garcia was "clearly the intermediary between Rosario Portillo[-Rodriguez] and the ultimate source(s) of the cocaine." Id. at 1557 ¶ 30. In addition, the Second Wiretap application disclosed the existence of a second confidential witness ("CW-2"), who had provided additional information to Detective Barnhill but had "indicated a reluctance to testify in any proceeding . . . out of fear for CW-2's personal safety and/or that of CW-2's family should CW-2's identity and cooperation be revealed." Id. at 1557 ¶ 32. Finally, the Second Wiretap application disclosed that on at least one occasion, Ceferino Castillo-Garcia and Ismael Armendariz-Amaya were tailed by visual surveillance officers, and that following that occasion, Ceferino Castillo-Garcia had told Rosario Portillo-Rodriguez that Castillo-Garcia had detected the surveillance. Id. at 1549, 1558.

The evidence regarding the extent to which Ceferino Castillo-Garcia was subject to visual surveillance is ambiguous. Neither Detective Barnhill nor any other law enforcement officer attested to having ever conducted or attempted surveillance of Ceferino Castillo-Garcia. Indeed, on cross-examination at the hearing on the defendants' Motion to Suppress, Detective Barnhill admitted that between the First Wiretap and the Fourth Wiretap, *he* undertook no investigatory steps, other than the Wiretaps. This admission led the district court to find as a factual matter that "after obtaining the First Wiretap, *the Government* undertook no 'normal investigation procedures' before seeking any of the subsequent wiretaps." Id. at 1551 (emphasis added). Detective Barnhill did, however, testify in his affidavit attached to the Second Wiretap application, that:

> On September 5, 1994, the following occurred: At approximately 7:00 P.M., surveillance officers followed CEFERINO CASTILLO-GARCIA and ISMAEL ARMENDARIZ-AMAYA from 6550 Benton Street to a shopping center located at West 72nd Avenue and Sheridan Boulevard. After a few moments, both individuals returned to 6550 Benton Street, Denver, Colorado.

(Rec. V.6 at 20 ¶ 23(a)). Nowhere else in the record is there any reference to visual surveillance of Ceferino Castillo-Garcia, Ismael Armendariz-Amaya, or any other defendant in the present proceeding.

While Detective Barnhill's statement could support an inference that both Ceferino Castillo-Garcia and Ismael Armendariz-Amaya were subject to extensive visual surveillance prior to the government's request for a wiretap of Ceferino

- 26 -

Castillo-Garcia's telephone, it could also support an inference that either Ceferino Castillo-Garcia or Ismael Armendariz-Amaya was "tailed" only once. The district court declined to resolve the extent to which visual surveillance of Ceferino Castillo-Garcia actually occurred. See id. at 1549. Because we must view the evidence in the light most favorable to the defendants, who prevailed below, United States v. Edwards, 69 F.3d 419, 428 (10th Cir. 1995), cert. denied, 116 S. Ct. 2497 (1996) (citing United States v. Williamson, 1 F.3d 1134, 1135 (10th Cir.1993)), we must assume that visual surveillance of Ceferino Castillo-Garcia was attempted only once, and then abandoned, and that no visual surveillance of the other defendants in the present case was ever attempted.

Even under this assumption, however, we think the government's aborted attempt at visual surveillance of Ceferino Castillo-Garcia satisfies the "standard visual and aural surveillance" prong of our test of necessity. In addition to his affidavit testimony suggesting that Ceferino Castillo-Garcia was tailed on the evening of September 5, 1994, Detective Barnhill also reported that Ceferino Castillo-Garcia was overheard, shortly thereafter, telling Rosario Portillo-Rodriguez that Ceferino Castillo-Garcia suspected the tail. See Castillo-Garcia, 920 F. Supp. at 1549. The district court found that Detective Barnhill's affidavit statement was:

> based on two conversations between Rosario Portillo-Rodriguez and Ceferino Castillo-Garcia overheard during the First Wiretap. On the

evening of September 5, 1994, Ceferino told Rosario that he 'saw them watching.' The next day he told Rosario that he intended to drive to Rosario's location 'to see if he . . . would be followed.'

Castillo-Garcia, 920 F. Supp. at 1549 (citations to the record omitted).

Even assuming *arguendo*, as we must, that the evening of September 5, 1994, was the one and only time that Ceferino Castillo-Garcia was ever subject to visual surveillance, we find it dispositive that, on that occasion, Ceferino Castillo-Garcia detected the surveillance.[9] We think that Ceferino Castillo-Garcia's *belief* that he was being watched extensively, when considered with the rest of the allegations contained in the First and Second Wiretap applications, adequately established that standard visual and aural surveillance of Ceferino Castillo-Garcia had been tried and failed and that future attempts to "tail" Ceferino Castillo-Garcia would be dangerous and probably futile. See United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903 (1987) (upholding wiretapping order where, as one factor in establishing "necessity," the government established that increased visual surveillance would have increased the possibility of detection).

We think that the government's application for the Second Wiretap also satisfied the "undercover agents or informants" prong of our test. In addition to

---

[9]There is no similar evidence tending to suggest that Ceferino Castillo-Garcia's companion of September 5, 1994, Ismael Armendariz-Amaya, ever detected any surveillance.

incorporating by reference the material from the First Wiretap application which detailed the year-long efforts of confidential informant CW-1 to determine the source of Rosario Portillo-Rodriguez's drugs, the application for the Second Wiretap also detailed the similarly unsuccessful efforts of a second confidential informant, CW-2. Further, the application for the Second Wiretap disclosed that conversations intercepted pursuant to the First Wiretap indicated that Ceferino Castillo-Garcia traveled to Juarez, Mexico to obtain cocaine and marijuana from the ultimate source. In our view, the use of CW-1 and CW-2 to attempt to determine the source of the drugs procured by Ceferino Castillo-Garcia and distributed by Rosario Portillo-Rodriguez indicates that "undercover agents or informants" had been tried and failed. Further, the information that the "ultimate source" was probably located in the Republic of Mexico implied that future attempts to use confidential informants for this purpose would probably be futile.

Similarly, the government's application for the Second Wiretap also satisfied the requirement here that it explore the normal investigative techniques of pen registers, trap and trace devices, and telephone toll records. In addition to incorporating by reference the material from the First Wiretap application which detailed the use of these normal investigative techniques against Rosario Portillo-Rodriguez's telephone numbers, the application for the Second Wiretap also referred to the use of pen registers, trap and trace devices, and telephone toll

records to investigate certain telephone numbers "known to be available to the subjects of this investigation." Id. at 1558 ¶ 37. The district court interpreted this statement to mean that "the Government continued . . . to use pen registers or trap and trace devices on the calls made from *each* intercepted number (in order to show that the additional target telephones were used in negotiating drug transactions). . . ." Id. at 1551 (emphasis added). If so, then pen registers or trap and trace devices were used against the two phone numbers which were the subjects of the Second Wiretap, but proved ineffective in assisting the government to determine the identity of the "ultimate source" of the drugs.

In our view, the Second Wiretap Application also satisfactorily explains why "general questioning or interrogation under an immunity grant" was not attempted against Ceferino Castillo-Garcia. Based on the information it had obtained from the First Wiretap, the government considered Ceferino Castillo-Garcia to be "clearly the intermediary between Rosario Portillo[-Rodriguez] and the ultimate source(s) of the cocaine." Castillo-Garcia, 920 F. Supp. at 1557 ¶ 30. As such, Ceferino Castillo-Garcia was presumably a very high ranking member of the suspected conspiracy, and therefore a "culpable individual." In its application for the Second Wiretap, the government clearly stated that "if called to testify, [Ceferino Castillo-Garcia] would likely invoke [his] Fifth Amendment privileges, and furthermore, that it would be unwise to seek Grand Jury immunity for any of

the subjects named herein because it might foreclose prosecution of culpable individuals." Id. at 1558 ¶ 36. The government also noted in its application that "interviews and attempts to develop witnesses would serve to alert the targets of the [ongoing] investigation, cause them to become more cautious, and perhaps prompt them to flee the jurisdiction to avoid further investigation or possible prosecution, since many of the subjects involved in this cocaine distribution enterprise have strong ties to the Republic of Mexico." Id. at 1558 ¶ 35. In our view, these statements satisfactorily support the government's claim that attempting to question Ceferino Castillo-Garcia--with or without an offer of immunity--would have probably have been both futile and generative of undesired consequences.

Finally, we think that under the government's recitation of the facts of the case, it would have been unreasonable to attempt the use of a regular search warrant against Ceferino Castillo-Garcia. As just discussed, the government clearly expressed in the application for the Second Wiretap its reasonable desire not to alert any of the targets of its investigation. Id. Executing a regular search warrant against Ceferino Castillo-Garcia would have alerted both him and his associates of the existence of an ongoing investigation.

Because we find that each prong of our necessity test was satisfied by the application for the Second Wiretap (94-WT-7), we reverse the district court's

grant of the defendants' Motion to Suppress evidence obtained from the Second

Wiretap.

**Third Wiretap (94-WT-8) (9/22/94)**:

The district court also found that the government's application for the Third

Wiretap failed to satisfy the necessity requirements of 18 U.S.C. §§ 2518(1)(c),

2518(3)(c) (1994).  Castillo-Garcia, 920 F. Supp. at 1549-52.  Reviewing this

conclusion *de novo*, we agree in part and disagree in part.  The Third Wiretap was

directed against two phone numbers assigned to digital display paging devices:

one used by Ceferino Castillo-Garcia, and one used by Jaime Olivas-Sanchez,

who, like Ceferino Castillo-Garcia, was suspected of being "the intermediary

between Rosario Portillo[-Rodriguez] and other source(s) of cocaine and

marijuana."[10]  Castillo-Garcia, 920 F. Supp. at 1559 ¶ 30.  The government sought

the Third Wiretap in order to determine where Ceferino Castillo-Garcia and Jaime

Olivas-Sanchez were obtaining their drug supplies.

---

[10]Like the phone numbers at issue in the Second Wiretap, neither of the two pager numbers which were subject to the Third Wiretap were subscribed to in the names of the Third Wiretap's targets.  For the reasons discussed in footnote 9, *supra*, however,  we discount the relevance of this fact.  It is uncontroverted that the pager numbers at issue here were in fact being used by Ceferino Castillo-Garcia and Jaime Olivas-Sanchez, who were the targets of the Third Wiretap.

As the district court noted, the application for the Third Wiretap incorporated by reference the application for the First Wiretap.[11]  See Castillo-Garcia, 920 F. Supp. at 1559 ¶ 28.  Further, the application for the Third Wiretap was filed and ruled on by Judge Sparr concurrently with the application for the Second Wiretap.  See id. at 1542, 1557, 1559.

For the reasons discussed in our analysis of the Second Wiretap, we believe that, as of September 22, 1994, the government had demonstrated sufficient necessity to wiretap the communications of Ceferino Castillo-Garcia.  Accordingly, we think that the necessity to wiretap phone number (303) 251-1594, a digital paging device allegedly being used by Ceferino Castillo-Garcia to receive late-breaking drug purchase orders while traveling in Mexico to purchase drugs, was sufficiently established.  We therefore reverse the order of the district court suppressing the evidence obtained from the wiretap of phone number (303) 251-1594.

_____

[11]As the district court noted, no copy of the application for the First Wiretap was actually attached to the application for the Third Wiretap.  See Castillo Garcia, 920 F. Supp. at 1559 ¶ 28 & n.2.  A copy of the application for the First Wiretap was, however, attached to the application for the Second Wiretap.  Id. at 1557 ¶ 29.  Because the Second and Third Wiretap applications were ruled on by Judge Sparr on the same day, id. at 1542, we are confident that, despite the government's clerical error, Judge Sparr was able to consider the relevant material from the First Wiretap application in ruling on the Third Wiretap application.

We substantially agree, however, with the district court's analysis of the lack of a showing of necessity for wiretapping the digital paging device assigned to phone number (303) 609-1931, and used by defendant-appellee Jaime Olivas-Sanchez. As the district court noted, Detective Barnhill swore in his affidavit attached to the Third Wiretap application that "a variety of normal and routine investigative techniques have been attempted during this investigation." See Castillo-Garcia, 920 F. Supp. at 1559 ¶ 28 (reprinting affidavit). Detective Barnhill's statement was technically true but largely misleading. The "variety of normal and routine investigative techniques" that had been attempted during "this investigation" consisted primarily of visual surveillance directed against just two suspects: Rosario Portillo-Rodriguez, see id. at 1542-43, and Ceferino Castillo-Garcia. (See Rec. V.6 at 20 ¶ 23(a); Aplt.'s Br. at 23). While criminal background checks, pen registers, and trap and trace devices were apparently used against suspect Jaime Olivas-Sanchez, no other "normal and routine investigative techniques" were ever directed against him, or, indeed, against any suspect other than Rosario Portillo-Rodriguez or Ceferino Castillo-Garcia. Castillo-Garcia, 920 F. Supp. at 1551-52.

This fact, standing alone, does not imply that the government lacked necessity to wiretap Jaime Olivas-Sanchez's digital paging device. As discussed *supra*, such a wiretap would qualify as "necessary" under 18 U.S.C. §§

2518(1)(c), 2518(3)(c) (1994) ever where *no* "normal investigative techniques" had even been tried, if *all* such techniques reasonably appeared either unlikely to succeed if tried, or too dangerous to try. We thus proceed to examine whether the government demonstrated in its application for the Third Wiretap the potential futility or danger of attempting "normal investigative techniques" against Jaime Olivas-Sanchez.

We agree with the district court that the factors set forth in the First and Second Wiretap applications to establish "necessity" to wiretap *Rosario Portillo-Rodriguez*'s and *Ceferino Castillo-Garcia*'s telephone numbers do not necessarily establish "necessity" to wiretap telephone numbers used by the other defendants. See Castillo-Garcia, 920 F. Supp. at 1551. In particular, we note that the First Wiretap application describes the difficulty of visual surveillance of the Raritan Street houses, and the difficulty of "tailing" Rosario Portillo-Rodriguez, who owned nine cars and frequented remote construction sites. Id. at 1555-56 ¶ 39. Similarly, the Second Wiretap application describes how visual surveillance of Ceferino Castillo-Garcia was tried and detected. Id. at 1557-58 ¶ 34(a).

The Third Wiretap application, by contrast, relies on wholly conclusory language which would apply to every member of every suspected drug conspiracy to explain why visual surveillance of Jaime Olivas-Sanchez, which was never attempted, would not have worked. The application says that:

- 35 -

> Surveillance of [each member of the suspected conspiracy] designed to identify all their distributors would require that their activities be monitored on a 24-hour basis. It is unlikely that such a surveillance operation could be conducted for more than a brief period of time before it was discovered, possibly placing the entire investigation in jeopardy. . . .
>
> In your affiant's experience, surveillance of these individuals has been successful only to a limited degree, in that prior knowledge of the subjects's activities enabled surveillance officers to observe meetings at known locations.

Id. at 1560 ¶ 34.

As the district court noted, nothing in this language is in any way particularized to Jaime Olivas-Sanchez. See id. at 1549 ("In contrast to the First Wiretap Affidavit, there is . . . no claim in the [Third] Wiretap application[] concerning circumstances which made surveillance unusually difficult."). Thus, we think that the "standard visual and aural surveillance prong" of our test was simply not established in the application for the Third Wiretap with respect to Jaime Olivas-Sanchez. Further, we can see no reason, based on the government's recitation of the facts of the case, why such standard visual and aural surveillance would not have worked against Jaime Olivas-Sanchez.

We have, of course, said that the "necessity" requirement "should be read in a common sense fashion." United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir.), cert. denied, 493 U.S. 981 (1989); see also Johnson, 645 F.2d at 867 ("affidavits in support of an application for a wiretap order . . . are to be read in a

practical and commonsense manner rather than hypertechnically") (citing cases).

However, we have also made it clear that a "common sense approach" will not rehabilitate the government's failure to include statutorily required information in a wiretap application. United States v. Mondragon, 52 F.3d 291, 293 (10th Cir. 1995).

Applying "common sense," we note that wiretapping is normally the safest and most efficacious way for law enforcement officers to gain useful information about a suspected drug conspiracy. However, we have declined to deduce from this "common sense" observation any *per se* rule that wiretapping is always "necessary" when there is probable cause to believe that the suspects are engaged in a drug conspiracy. See Mondragon, 52 F.3d at 293-94 (suppressing evidence of drug conspiracy obtained pursuant to wiretapping warrant because "necessity" for wiretap was not established in warrant application). Rather, we have said that:

> The necessity requirement directly and substantially implements the congressional intention to limit the use of intercept procedures to those situations clearly calling for their employment. As a result, failure to satisfy this requirement requires that the contents of the intercepted communications and the evidence derived therefrom be suppressed.

Id. at 294 (citing United States v. Donovan, 429 U.S. 413, 433-34 (1977)) (internal punctuation and citations omitted).

Our approach to the "necessity" requirement of Title III is consistent with the opinion of the Supreme Court in United States v. Giordano, 416 U.S. 505 (1974). In Giordano, the Court described the congressional intent underlying Title III as follows:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

Id. at 515.

In the present case, the Third Wiretap application simply failed to contain any evidence, other than conclusory evidence that would apply to virtually *all* drug conspiracy investigations, that "normal investigative procedures"--particularly "standard visual and aural surveillance"--would have been unlikely to succeed if tried against Jaime Olivas-Sanchez, or that such procedures were too dangerous to try. Title III, however, requires that such evidence be stated "full[y] and complete[ly]," 18 U.S.C. § 2518(1)(c) (1994), i.e. in a *particularized* manner. We therefore affirm the order of the district court suppressing the evidence obtained during the Third Wiretap from wiretapping phone number (303) 609-1931.

**Fourth Wiretap (94-WT-10) (10/7/94)**:

The district court found that the government's application for the Fourth Wiretap failed to satisfy the necessity requirements of 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). Castillo-Garcia, 920 F. Supp. at 1549-52. Reviewing this conclusion *de novo*, we disagree.

The Fourth Wiretap was directed against Ceferino Castillo-Garcia's home telephone number, which was subscribed to in Ceferino Castillo-Garcia's own name. It was predicated in part on information obtained in the earlier wiretaps. The government sought the Fourth Wiretap on October 7, 1994, by which time Ceferino Castillo-Garcia had stopped making many of his drug-related "business" calls from the phone numbers which were subject to the Second Wiretap, and had begun making such calls from his home phone number. The purpose of the Fourth Wiretap was identical to the purpose of the Second Wiretap: to determine where Ceferino Castillo-Garcia was allegedly obtaining his drug supplies.

As the district court noted, the application for the Fourth Wiretap incorporated by reference the applications for the First and Second Wiretaps. See Castillo-Garcia, 920 F. Supp. at 1561 ¶ 37 & nn.3 & 4. For the reasons discussed in our analysis of the Second Wiretap, we believe that, as of October 7, 1994, the government had demonstrated sufficient necessity to wiretap the communications of Ceferino Castillo-Garcia. We do not think that Ceferino Castillo-Garcia could

- 39 -

defeat this showing of necessity simply by changing phone numbers. Accordingly, we think that the government established sufficient necessity to wiretap phone number (303) 477-2721. We therefore reverse the order of the district court suppressing the evidence obtained from the Fourth Wiretap.

**Fifth Wiretap (94-WT-11) (10/21/94)**:

The district court found that the government's application for the Fifth Wiretap failed to satisfy the necessity requirements of 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). Castillo-Garcia, 920 F. Supp. at 1549-52. Reviewing this conclusion *de novo*, we agree.

The Fifth Wiretap, which was applied for and granted on October 21, 1994, was directed against a telephone number subscribed to under the name of "M. Olivas," and allegedly used by Jaime Olivas-Sanchez to conduct drug-related conversations with Rosario Portillo-Rodriguez. The purpose of the Fifth Wiretap was identical to one of the purposes of the Third Wiretap: to determine where Jaime Olivas-Sanchez was allegedly obtaining his drug supplies.

As the district court noted, the application for the Fifth Wiretap incorporated by reference the applications for the First and Third Wiretaps.[12] See Castillo-Garcia, 920 F. Supp. at 1563 ¶ 30 & nn.5 & 6. For the reasons discussed

---

[12]As in some of the earlier applications, the government explained that telephone toll records, pen register and trap and trace devices had been utilized but that those devices had not revealed the identities of further participants in the conspiracy. Castillo-Garcia, 920 F. Supp. at 1565 ¶ 37.

in our analysis of the Third Wiretap, we believe that, as of September 22, 1994, the government had not demonstrated sufficient necessity to wiretap the communications of Jaime Olivas-Sanchez. We see nothing in the government's October 21, 1994 application for the Fifth Wiretap which adds anything to its earlier inadequate showing. We therefore affirm the order of the district court suppressing the evidence obtained from the Fifth Wiretap.

IV.

In concluding its Order granting the defendants' Motion to Suppress evidence obtained from the Second through Fifth Wiretaps, the district court said the following:

> It is evident the Government's approach here was to move swiftly from wiretap to wiretap, without pausing to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap. The Government sought each succeeding wiretap solely because defendants were suspected to be members of the conspiracy under investigation. Such suspicion, while it may satisfy the probable cause element of the wiretap statute, is an insufficient basis for a wiretap. If the Constitution and the statutory procedures of title III are to have any real meaning . . ., the Government must be held to a standard above that which is revealed by the facts of this case.

Castillo-Garcia, 920 F. Supp. at 1552 (internal citations omitted).

Reviewing this conclusion *de novo*, we find that with respect to defendant-appellee Ceferino Castillo-Garcia, the government did attempt certain "normal

investigative procedures," sufficient to justify its subsequent recourse to wiretapping. We agree with the district court, however, that no such techniques were ever attempted against any of the other defendants in the present case, nor was the government's failure to do so explained in terms adequately particularized to the facts of the case at hand. We further agree with the district court's admonition that, even within an ongoing investigation of a suspected drug conspiracy, the government may not simply "move swiftly from wiretap to wiretap." Id. Rather, under Title III, it must always "paus[e] to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." Id.; compare United States v. Killingsworth, No. 96-6021 (10th Cir. June 30, 1997) (providing an example of a wiretap application in full compliance with the letter and spirit of Title III).

V.

Also before us is the government's appeal of the district court's denial of its motion for reconsideration. United States v. Castillo-Garcia, No. 94-CR-371, slip op. at 5-8 (D. Colo. May 23, 1996) (unpublished order & mem.). An appeal of a district court's denial of a motion to reconsider "raises for review only the district court's order of denial and not the underlying judgment itself." Van

Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir. 1991), cert. denied, 506 U.S. 828 (1992) (citing cases). "Therefore, we review a denial of a motion to reconsider only for an abuse of discretion." Elsken v. Network Multi-Family Sec. Corp., 49 F.3d 1470, 1476 (10th Cir. 1995).

Here, the district court found that "the Government raise[d] *no new law or facts*" in its motion to reconsider, i.e. no arguments based either on newly discovered evidence or on legal authority promulgated subsequent to the hearing on the suppression motion. United States v. Castillo-Garcia, No. 94-CR-371, slip op. at 8 (D. Colo. May 23, 1996) (unpublished order & mem.) (emphasis in original). Indeed, the government apparently *conceded* that it had never raised the "good faith exception" argument until after the defendants' motion to suppress had been granted. Id. at 5. As the district court noted, arguments raised for the first time in a motion for reconsideration are not properly before the court and generally need not be addressed. Burnette v. Dresser Indus., Inc., 849 F.2d 1277, 1285 (10th Cir. 1988) (citing Eureka Carlisle Co. v. Rottman, 398 F.2d 1015, 1019 (10th Cir. 1968)). Thus, the district court did not abuse its discretion when it denied the government's motion to reconsider.

Normally, when a claim is "not considered or ruled upon by the district court, we will not address it on appeal." Id. We thus decline to reach the question of whether, notwithstanding the plain language of 18 U.S.C. § 2515

- 43 -

(1994), a "good faith exception" might permit the admission of wiretap evidence obtained pursuant to a facially valid wiretapping order issued in violation of Title III.

## CONCLUSION

We REVERSE the order of the district court granting the defendants' suppression motions with respect to the Second Wiretap (94-WT-7) and the Fourth Wiretap (94-WT-10)  We AFFIRM the order of the district court granting the defendants' suppression motion with respect to the Fifth Wiretap (94-WT-11).

We AFFIRM IN PART and REVERSE IN PART the district court's order granting the defendants' suppression motion with respect to the Third Wiretap (94-WT-8).  Specifically, we affirm the district court's order suppressing evidence obtained from wiretapping phone number (303) 609-1931, but reverse the district court's order suppressing evidence obtained from wiretapping phone number (303) 251-1594.

Finally, we AFFIRM the district court's denial of the government's motion for reconsideration.