**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### TENH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOHNNY RAY GARCIA,

      Defendant-Appellant.

No. 98-1334

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-CR-197-D)**

Brian K. Holland, Holland, Kaplan & Pagliuca, P.C., Denver, Colorado for
Defendant-Appellant.

John M. Hutchins, Assistant United States Attorney (Thomas L. Strickland,
United States Attorney, and Stephanie P. Podolak, Assistant United States
Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

Before **EBEL, PORFILIO,** and **MAGILL,**[*] Circuit Judges.

**EBEL**, Circuit Judge.

---

     [*] Honorable Frank J. Magill, Senior Circuit Judge, United States Court of
Appeals for the Eighth Circuit, sitting by designation.

Appellant Johnny Ray Garcia appeals the district court's denial of his motion to suppress evidence obtained through two court-ordered wiretaps. Specifically, Appellant contends the district court erred in finding that the wiretaps were necessary and were appropriately minimized as required by 18 U.S.C. § 2518(1)(c), (3)(c), (5) (1994 & Supp. 1999). For the reasons stated below, we AFFIRM.

## BACKGROUND

In 1996, members of the FBI's Metro Gang Task Force ("MGTF") were investigating suspected gang-related drug activity in Denver, Colorado. Specifically, MGTF was investigating members of the West Side Ballerz Posse ("WSBP"), whom it suspected were selling controlled substances and engaging in gang-related violence. As part of this investigation, a series of wiretaps were authorized in late 1996 against suspected members of this drug conspiracy. On March 12, 1997, United States District Judge John L. Kane authorized a wiretap against a telephone used by Michael Vasquez. It was suspected that Vasquez was a member of the WSBP and involved in illegal drug dealing. This wiretap (hereinafter the "Vasquez wiretap") revealed that Vasquez was engaging in drug transactions with John Chavez, Jr. ("Chavez"), the alleged leader of the WSBP.

Soon thereafter, the government filed an application for wiretaps against two telephones believed to be used by Chavez in his drug dealing. "Subject

Telephone One" was a cellular telephone using the number (303) 887-5533. "Subject Telephone Two" was a landline telephone using the number (303) 255-2064. In support of the application, the government submitted a lengthy affidavit from FBI Special Agent Kurt A. Remus detailing the nature of the investigation to date and the need for the requested wiretaps. Judge Kane authorized the wiretaps (hereinafter the "Chavez wiretaps") on April 8, 1997.

During the course of the Chavez wiretaps, law enforcement officers collected incriminating information against Appellant. Appellant moved to suppress the evidence gathered via the Chavez wiretap. The district court held a hearing on the matter and denied Appellant's motion to suppress. Appellant subsequently pleaded guilty to Use of a Communications Facility, a Telephone, to Facilitate Conspiracy to Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 843(b) & (d), 841(a)(1), 846. Pursuant to the plea agreement, Appellant reserved the right to challenge the district court's denial of his motion to suppress, which he now appeals.

**DISCUSSION**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, lays out a strict framework for authorizing electronic eavesdropping by law enforcement officials. See 18 U.S.C. §§ 2510-2522 (1994 & Supp. 1996). First, a law enforcement officer must obtain approval from the Attorney General

of the United States or her designee to seek the appropriate order from a federal judge.  See 18 U.S.C. § 2516(1) (Supp. 1999).   Second, the officer must submit to the judge a written application for the wiretap.  See 18 U.S.C. § 2518(1) (Supp. 1999).  Third, the judge must issue an ex parte order granting the application and making specific supporting findings.  See 18 U.S.C. § 2518(3); United States v. Castillo-Garcia, 117 F.3d 1179, 1184-85 (10th Cir. 1997).

One of the findings a judge must make when authorizing a wiretap is that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c) (1994).  In our cases, this is known as the "necessity" requirement. See Castillo-Garcia, 117 F.3d at 1185.  The statute additionally requires that "[e]very [wiretap] order . . . shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."  18 U.S.C. § 2518(5) (Supp. 1999).  It is thus required that law enforcement agents conducting the wiretap intercepts "minimize" the intrusion into otherwise lawful communications.  In the present case, Appellant contests both the necessity and minimization of the wiretaps leading to his arrest and subsequent conviction.

"On appeal from a motion to suppress evidence obtained pursuant to a wiretap, we accept the district court's factual findings unless clearly erroneous,

- 4 -

review questions of law *de novo*, and view the evidence in the light most favorable to the prevailing party." <u>Castillo-Garcia</u>, 117 F.3d at 1186. We note that there is a conflict of authority in this circuit regarding the appropriate standard of review to apply to a district court's determination that a wiretap application satisfies the necessity requirement. <u>Compare</u> <u>Castillo-Garcia</u>, 117 F.3d at 1186 ("The question of whether the government demonstrated sufficient 'necessity' under 18 U.S.C. § 2518(1)(c) (1994) to support the issuance of a wiretapping order is a question of law which we review *de novo*."), <u>with</u> <u>United States v. Armendariz</u>, 922 F.2d 602, 608 (10th Cir. 1990) ("[W]e review the conclusion that the wiretap was necessary in each situation for an abuse of discretion.") (alterations omitted). It is not necessary to resolve this issue in the present case, however, because we would reach the same result under either standard of review.

## I. Necessity

In <u>Castillo-Garcia</u>, we laid out the criteria for determining whether the necessity requirement was satisfied:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are:

(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.

Castillo-Garcia, 117 F.3d at 1187. We further stated that "it is not necessary for the government formally to address each category with an explanation . . . if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." Id. at 1188. This approach is consistent with our adherence "to Congress's intention that the government's demonstration of the necessity for instituting a wiretap be evaluated in a practical and commonsense fashion." Id. at 1187 n.5.

With these standards in mind, we analyze the applications for the wiretaps at issue in this case.

**(1) Visual and Aural Surveillance**

The affidavit supporting the wiretaps indicated that some surveillance had been attempted, but that further surveillance would be difficult, would potentially compromise the investigation, and would likely be ineffective at identifying Chavez's drug suppliers. The affidavit stated that Officer Adam Fuller of the Adams County Sheriff's Office had conducted physical surveillance of the WSBP

for three years. The affidavit further stated that Officer Fuller was able to identify many members of the WSBP through surveillance, but that "many of the known residences and businesses connected to the WSBP are extremely difficult to conduct surveillance on." Officer Fuller also indicated to the affiant that "it is not possible to determine the full nature and scope of the . . . offenses by the use of physical surveillance." The affiant concluded that although "[s]urveillance has been used to stop and identify possible unnamed co-conspirators . . . continued use of this tactic could compromise the investigation."

In light of these statements, we conclude that the officers had attempted to investigate the WSBP and Chavez through traditional surveillance techniques, but that further reliance on this tactic would likely be unsuccessful. As described in the supporting affidavit, it was clear that Chavez conducted a great deal of his drug transactions via telephone, thus placing limits on the effectiveness of less intrusive methods of investigation. While use of telephones to conduct criminal activity does not necessarily warrant a wiretap, in this case evidence against the upper echelon of the WSBP and against Chavez's suppliers could not have reasonably been obtained via traditional forms of surveillance.

**(2) Questioning and Interrogation of Witnesses and Participants**

The supporting affidavit indicates that witnesses and participants to the suspected drug transactions were interviewed prior to seeking the Chavez

wiretaps, but that further use of this investigative technique would not be effective to reveal the full scope of the conspiracy. In fact, the affidavit indicated that questioning individuals involved with the WSBP might actually be counterproductive with respect to uncovering the source of the drugs sold by Chavez. Soon after the government interviewed a co-conspirator, Chavez suspected that co-conspirator was cooperating and he "changed his pager and cellular telephone number[s] immediately, causing a three (3) month delay in the current investigation." In addition, another co-conspirator indicated to Officer Fuller that he would not cooperate with investigators unless Chavez and his organization had been formally indicted. Similarly, another suspected member of the WSBP, although initially indicating a willingness to cooperate, ultimately refused to do so and was a fugitive at the time the affidavit was submitted. Finally, the affidavit asserts that use of the grand jury to compel witnesses to testify would alert unknown co-conspirators and thus unduly limit the scope and effectiveness of the investigation.

We find that these statements, viewed in the context of the investigation into this conspiracy, indicate that the law enforcement officers had reasonably attempted to use witness and participant testimony to gather evidence against Chavez. It is clear, however, that these interviews did not enable the officers to identify the source from which Chavez obtained the drugs. Moreover, use of the

grand jury would likely have alerted Chavez and his suppliers to the investigation, thus limiting its effectiveness. The investigators had attempted to contact and secure the cooperation of witnesses and participants prior to seeking the Chavez wiretaps, but these traditional techniques were not sufficient to fully disclose the conspiracy.

**(3) Search Warrants**

The affidavit states that at least two search warrants had been executed in this investigation, but that these efforts "failed to produce enough evidence to successfully prosecute Chavez and his organization." The affidavit also indicates that further search warrants would not reveal the full extent of Chavez's activities or his suppliers. We agree that the conspiracy described in the affidavit could not be fully investigated through the use of search warrants.

Investigators were particularly concerned with identifying Chavez's source for drugs, but it seems unlikely that physical evidence seized would reveal this information. Moreover, execution of additional warrants against Chavez or his confederates might have alerted unknown co-conspirators to the investigation and allowed them to avoid capture. On the facts of this case, where the investigation targeted the upper echelon of the conspiracy and sought to identify the ultimate source for the drugs, additional search warrants would likely have been ineffective.

**(4) Infiltration and Use of Informants**

It is clear that the investigators repeatedly used confidential informants to gather information on Chavez and the WSBP but were unable to gather sufficient evidence through this technique to prosecute Chavez and identify his suppliers. Multiple confidential informants were used to uncover the basic framework and participants of the conspiracy, but this information was insufficient to fully reveal its innermost workings. Specifically, the affidavit stated that "[n]one of the confidential sources have been able, themselves, to obtain information regarding John A. Chavez, Jr.'s current drug suppliers[, and c]onfidential sources have been unable to introduce undercover agents into Chavez [due] to the close nature of the WSBP." Moreover, one of the confidential informants ceased cooperating with law enforcement officers.

We agree that further use of confidential informants would likely prove ineffective in discovering the full scope of the conspiracy. The affidavit describes the WSBP as a "close" organization, and the knowledge of the confidential sources as limited. The assistance of confidential informants was also limited by their "unwillingness to testify against Chavez and his organization because they fear for themselves and their families the possibility of retribution by Chavez and the WSBP." We conclude the law enforcement officers had made reasonable attempts to use informants, but that further use of this technique or

attempts to infiltrate the organization would be ineffective and potentially dangerous.

**(5) Pen Registers and Trap and Trace Devices**

The affidavit indicates that pen registers were employed and indicated that the telephones to be tapped were frequently used to contact known participants in the conspiracy. There were multiple and repeated calls from the subject telephone numbers to numerous people who had ties to the criminal activity under investigation. However, the knowledge that these calls took place does not indicate the nature or scope of any criminal activity, and thus this data was insufficient to complete the investigation. In fact, the pen register data highlighted the extent to which the co-conspirators relied on telephone communications to conduct their drug trade, further demonstrating the need for the wiretaps.

In sum, it appears from the affidavit that law enforcement officers did attempt all five categories of traditional investigative techniques before seeking the Chavez wiretaps. Appellant contends, however, that these activities had all been completed more than forty-five days before the preceding wiretap (the Vasquez wiretap) had been obtained. Although we have held that the government may not "move swiftly from wiretap to wiretap," Castillo-Garcia, 117 F.3d at 1196, the government is not necessarily under an obligation to repeat these forms

of investigation between each wiretap. "Rather, under Title III, it must . . . pause to consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." Id. (alteration and internal quotation marks omitted).

We conclude the affidavit in support of the Chavez wiretaps indicates that the government did appropriately pause before seeking the wiretaps. Even though many of the same facts were previously offered in support of the Vasquez wiretap, it is apparent that the nature of the investigation had not substantially changed in the intervening time period. Chavez was still suspected to be the head of the conspiracy, but the extent of his dealings and the source from which he obtained the drugs remained unknown. Perhaps most significantly, the fact that Chavez was the highest known participant in the conspiracy made it difficult to collect information on him and his suppliers from lower-level members. Indeed, the affidavit explains that recordings from the Vasquez wiretap "show Chavez's capacity to sell cocaine, [but] they do not identify Chavez's supplier." Thus, the preceding wiretaps did not obviate the need for the Chavez wiretaps, nor were there new circumstances or events suggesting that the law enforcement officers should have retried traditional investigative techniques.

Our analysis must be guided by common sense, which clearly indicates that the Chavez wiretaps were necessary under these circumstances. The affidavit

explained both how traditional investigative procedures had been attempted and how further reliance on these means would be unhelpful or even counterproductive. Thus, under the facts of this case, we conclude that the Chavez wiretaps were necessary to reveal the full scope of the conspiracy and to identify Chavez's suppliers.

## II. Minimization

Appellant also contends that six of the eighteen calls intercepted under the Chavez wiretaps and pertaining to Appellant were not minimized in accordance with 18 U.S.C. § 2518(5). "The Supreme Court has held that this provision does not create an 'inflexible rule of law,' but rather demands an evaluation of the 'facts and circumstances of each case.'" United States v. Killingsworth, 117 F.3d 1159, 1165 (10th Cir. 1997) (quoting Scott v. United States, 436 U.S. 128, 139-40, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978)). Moreover, "'more widespread surveillance' is justified when the wiretap is targeted toward what is thought to be a widespread conspiracy." Id. at 1165-66. In light of these standards, we analyze the disputed interceptions.

## (1) Call 44

The district court found that this call contained coded references to quantities of marijuana. Appellant has offered no evidence disputing this factual determination. Rather, Appellant contends that the interception should have been

terminated before these comments were made. The district court found, however, that the length of the call "was extended by an initial pause as well as a period of time during which the call was placed on hold." Appellant does not dispute this finding, which is supported by our review the record. The length of the call alone does not render the interception improper. We therefore conclude that, under these circumstances, it was appropriate to continue the recording while the call was delayed and put on hold. Accordingly, the interception had not continued too long before the discussion of criminal activity was recorded.[1]

**(2) Call 770**

The district court found that this call was minimized three times by the monitor, and that the portions recorded "include[d] graphic and detailed accounts of a serious assault, which, the Court finds, [are] criminal in nature." Appellant offers no evidence indicating that these findings are clearly erroneous, and our review of the transcript supports the district court's conclusions. The wiretap required minimization "unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature." Call

---

[1] The tapes containing these calls were played at the March 12, 1998, suppression hearing in the district court. Our review of the transcript of this hearing, in which five of the six recordings are transcribed, reveals that the recorded conversation in Call 44 (not including the time on hold) was relatively brief. (The tape of Call 1378 was not played at the hearing, but a government agent did read portions of the transcript.)

770 clearly pertained to criminal activity, i.e., assault, and thus it was proper for the officers to continue recording.

**(3) Call 774**

The district court found that this call was "twice minimized even though it involved a named interceptee (John Chavez, Jr.) as well as references to selling drugs ('win some cash') and assaultive conduct." The district court further found that the call contained "two references to gang membership which was highly relevant to the government's instant investigation." Although Appellant notes that the agent who testified at the suppression hearing admitted that it was possible that "win[ning] some cash" referred to legal gambling, Appellant offers no reason why the district court's conclusion that the statement in fact referred to illegal activity was erroneous. Our review of the hearing transcript supports the district court's conclusion. Moreover, the overwhelming majority of the recorded conversation was in regard to assaultive conduct, which is criminal in nature and may therefore be lawfully intercepted. Accordingly, this call was properly recorded.

**(4) Call 1378**

The district court found that this call contained "references to shooting at individuals and purchasing additional firearms using the proceeds from the sale of drugs." Appellant does not dispute the substance of these references, rather he

contends that they were not pertinent to the investigation and should therefore have been minimized. As we have explained above, however, the wiretap authorized agents to continue recording where it was evident that criminal activity was being discussed and, in any event, there is reason to believe that all the criminal conduct discussed was related. These statements were properly intercepted. Moreover, the district court found that the call also referenced "'dudes' from El Paso," and that it was suspected that the WSBP obtained drugs from a source in El Paso, Texas. Thus, this conversation clearly pertained to criminal activity and was therefore properly intercepted.

**(5) Call 1400**

The district court concluded that "the call involved mention of weapons and assaultive behavior." Our review of the transcript supports this conclusion. The bulk of the conversation relates to gang violence, and when the conversation shifted to another subject matter, the call was minimized. The district court's findings were not erroneous, and, because the conversation pertained to criminal activity, the conversation was properly recorded.

**(6) Call 1632**

The district court concluded that this call contained references to gang violence and selling narcotics. Our review of the transcript confirms this conclusion. Appellant discussed entering a rival gang's hangout, to which

Chavez replied that "[we] [s]hould blow that place up." Later in the conversation, Appellant stated he needed to "make some cash to get rolling," which the government agent testified referred to selling narcotics. Thus, the district court's findings were not erroneous. Because the conversation pertained to criminal activity, it was properly recorded.

In sum, we conclude that these interceptions do not violate 18 U.S.C. § 2518(5). All of the calls directly reference criminal activity or other matters relevant to the government's investigation. Accordingly, they are within the scope of the district court's authorization and permissible under § 2518(5).

## CONCLUSION

We find no error in the district court's determination that the Chavez wiretaps satisfied the necessity and minimization requirements. Accordingly, the judgment of the district court is AFFIRMED.