UNITED STATES of America,
Plaintiff,

v.

Johnny Shane WRIGHT,
et al., Defendants.

Nos. 00–40024–02–SAC, 00–40024–03–SAC, 00–40024–06–SAC, 00–40024–10–SAC.

United States District Court,
D. Kansas.

June 26, 2001.

---

Tricia A. Barr, Overland Park, KS, pro se.

Thomas J. Bath, Jr., Overland Park, KS, pro se.

Amy J. Bipes, Topeka, KS, pro se.

Paula B. Boyd, Joplin, MO, pro se.

Melissa Dawn Bunce, Galena, KS, pro se.

Terrence J. Campbell, Lawrence, KS, pro se.

Thomas D. Carver, Springfield, MO, pro se.

James G. Chappas, Jr., Topeka, KS, pro se.

Janet Marie Cline, Quapaw, OK, pro se.

Timothy Jay Cline, Quapaw, OK, pro se.

Edward M. Collazo, Topeka, KS, pro se.

Chris N. Cowger, Topeka, KS, pro se.

Clarise J. Flowers, Galena, KS, pro se.

Lori L. George, Galena, KS, pro se.

E. Jay Greeno, Wichita, KS, pro se.

Thomas D. Haney, Topeka, KS, pro se.

Jeannine D. Herron, Topeka, KS, pro se.

Rhonda L. Hibbard, Baxter Springs, KS, pro se.

Donald R. Hoffman, Topeka, KS, pro se.

Charles William Hopkins, Galena, KS, pro se.

Michael W. Hopkins, Galena, KS, pro se.

Barbara K. Huff, Lawrence, KS, pro se.

Michael M. Jackson, Topeka, KS, pro se.

Joseph D. Johnson, Topeka, KS, pro se.

Richard E. Jones, Topeka, KS, pro se.

Kurt P. Kerns, Wichita, KS, pro se.

Stephen W. Kessler, Topeka, KS, pro se.

Eric Kjorlie, Topeka, KS, pro se.

Ginger Lyn Kraft, Baxter Springs, pro se.

J. Richard Lake, Holton, KS, pro se.

Clinton W. Lee, Topeka, KS, pro se.

Thomas G. Lemon, Topeka, KS, pro se.

Anthony W. Mattivi, Topeka, KS, pro se.

Jimmy D. Mauldin, Webb City, MO, pro se.

Dwight L. Miller, Topeka, KS, pro se.

Linda Rochelle Mitchell, Silver Lake, KS, pro se.

Daniel E. Monnat, Wichita, KS, pro se.

William Martin Mulkey, Seneca, MO, pro se.

Shane Allen Newman, Camdenton, MO, pro se.

Dan W. Pennock, Galena, KS, pro se.

JoAnn Pennock, Galena, KS, pro se.

Lonnie Joe Pitman, Galena, KS, pro se.

David S. Rauzi, Overland Park, KS, pro se.

Steven Keith Rawlins, Riverton, KS, pro se.

Mark J. Sachse, Kansas City, KS, pro se.

Mark T. Schoenhofer, Wichita, KS, pro se.

Candi Jane Sisk, Pittsburgh, KS, pro se.

Gary Duane Wininger, Galena, KS, pro se.

Mark Lee Wittenmyer, Galena, KS, pro se.

Mickey Scott Wittenmyer, Baxter Springs, KS, pro se.

Vellea Ann Wittenmyer, Baxter Springs, KS, pro se.

Matthew B. Works, Topeka, KS, pro se.

## MEMORANDUM AND ORDER

CROW, District Senior Judge.

The case comes before the court on the defendant Rhonda Hibbard's Motion to Suppress Wiretap Interceptions (Dk. 551); the defendant Michael Hopkins' Motion to Suppress Wiretap Evidence (Dk. 583); and the defendant Timothy Cline's Motion to Suppress Evidence Derived from Interception of Wire Communications (Dk. 618). The defendants Melissa Bunce, Janet Cline, John Cervine, Ginger Breuil, and Johnny Shane Wright have filed respective motions to join these motions to suppress. (Dks. 643, 698, 708, 716 and 719). The court grants these motions to join on the conditions expressed in the court's Criminal Procedural Guidelines § I, ¶ F. The government filed a consolidated response to these motions to suppress wiretap evidence (Dk.748), to which the defendant Timothy Cline filed a reply memorandum (Dk. 776), and to which the government filed a surreply memorandum.

## BACKGROUND

As part of its investigation leading to this indictment, the government sought and received permission to intercept wire communications on five separate telephone lines: (1) the residential telephone of Shane and Tracy Wright—Line A; (2) a cellular telephone subscribed to Miste Alartosky—Line B; (3) a cellular telephone subscribed to Johnny Wright—Line C; (4) the business telephone for Biker's Dream—Line D; (5) the residential telephone of Timothy and Janet Cline—Line E. The interception of Line A calls was authorized on November 22, 1999, terminated on December 21, 1999, authorized to resume on December 30, 1999, following the holidays, and extended for a final period ending February 27, 2000. The interception of Line B calls was authorized on November 22, 1999, and terminated on December 21, 1999, with no extensions. The interception of Line C calls was authorized on December 30, 1999, and extended for a final period ending February 27, 2000. The interception of Line D calls was authorized on February 15, 2000, and was extended for the final period ending March 15, 2000. All of these orders authorizing and extending the interception of wire communications were signed by Senior Judge Richard Rogers of the United States District Court for the District of Kansas.

On February 25, 2000, Judge Sven Erik Holmes of the United States District Court for the Northern District of Oklahoma signed an order authorizing the interception of Line E. This order was not extended, and the monitoring ended before the period terminated on March 23, 2000.

In the orders authorizing the interceptions or extending the interceptions, there appears the requirement that the monitoring of wire communications be limited to those communications relevant to the pending investigation in accordance with the minimization requirement found at 18 U.S.C. §§ 2510 *et seq.* The orders also provide that, "[i]f the conversation is minimized, the monitoring personnel shall spot check to insure that the conversation has not turned to criminal matters." *See, e.g.* (Dk.275, Ex. B, p. 6). The orders further direct the government applicant to provide the court with progress reports every ten days that show "what progress has been made toward the achievement of the authorized objective and the need for continued interception." *See, e.g., id.*

## SUMMARY OF ARGUMENTS AND ISSUES

The defendants challenge the government's interception of wire communication and all evidence derived from it as being acquired in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* and the Fourth Amendment to the United States Constitution. Considered together, the defendants' arguments reduce to the following issues:

I. Were the wiretap applications properly authorized by a designate representative of the Attorney General of the United States?

II. Were the wiretap applications sufficient to meet the necessity requirement of Title III?

III. Were the tape recordings protected from editing and alterations, made available to the judge immediately upon expiration of interception order, and sealed or stored in accordance with the judge's instructions?

IV. Was the inventory from the residential wiretap on Line E served on the defendant Timothy Cline?

V. Did the officers conduct the surveillance in a manner as to minimize the interception of nonpertinent conversations?

VI. Were the wiretaps on Lines D and E and the wiretap extensions on Line A the fruits of an illegal search and seizure?

The court will address the above issues *seriatim.*

## TITLE III FRAMEWORK

The Tenth Circuit in *United States v. Garcia*, 232 F.3d 1309, 1312 (10th Cir. 2000), recently summarized this framework:

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, lays out a strict framework for authorizing electronic eavesdropping by law enforcement officials. *See* 18 U.S.C. §§ 2510–2522 (1994 & Supp.1996). First, a law enforcement officer must obtain approval from the Attorney General of the United States or her designee to seek the appropriate order from a federal judge. *See* 18 U.S.C. § 2516(1) (Supp.1999). Second, the officer must submit to the judge a written application for the wiretap. *See* 18 U.S.C. § 2518(1) (Supp.1999). Third, the judge must issue an ex parte order granting the application and making specific supporting findings. *See* 18 U.S.C. § 2518(3); *United States v. Castillo–Garcia*, 117 F.3d 1179, 1184–85 (10th Cir.1997).

Before authorizing a wiretap, the judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This requirement is known in the case law as the "necessity" requirement. *United States v. Garcia*, 232 F.3d at 1312. An order authorizing the interception of wire communications must "contain a provision that the authori-

zation to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). This requirement is known in the case law as the "minimization" requirement whereby officers are required to minimize the interception of lawful communications. *United States v. Garcia*, 232 F.3d at 1312.

## PROPERLY AUTHORIZED APPLICATION

■ The defendant Cline's motion summarily contends the applications were not properly authorized by a specially designated representative of the Attorney General of the United States, 18 U.S.C. § 2516(1). His memorandum in support does not explain or even address this issue. In its response, the government says it inquired of defense counsel about the basis of this issue and learned the challenge went to the lack of signatures on the authorization letters. To its memorandum, the government attaches Order No.1950–95 from the Office of the Attorney General that specially designates those officers that may authorize Title III applications. The government also attaches copies of each authorization letter submitted with the applications and represents that each letter is signed by a specially designated representative. The defendant Cline replies that the letters lack original signatures and are simply rubber stamped by unknown persons. In its surreply, the government contends the burden is with the defendant to show any irregularity and the defendant's unsupported argument does not rebut the presumption of propriety that arises from an authorized officer affixing his or her signature to the letter. Because Title III does not specify the particular manner in which the Department of Justice must authorize an application, the government disputes any requirement for an original signature.

The requirement in 18 U.S.C. § 2516(1) that an application be authorized by an official specially designated by the Attorney General serves "the purpose of limiting such authority to identifiable officials in positions of trust." *United States v. Anderson*, 39 F.3d 331, 339 n. 6 (D.C.Cir. 1994), *modified in part on other grounds*, 59 F.3d 1323 (D.C.Cir.) (en banc), *cert. denied*, 516 U.S. 999, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995). The letters of authorization here identify the officials who are responsible for having exercised this approval authority. That another official signed on behalf of the authorizing official does not appear to contravene any statutory requirement. Indeed, Title III does not prescribe the manner in which authorization is accomplished or shown. In *United States v. Pichardo*, 1999 WL 649020, at *4 (S.D.N.Y. Aug.25, 1999), the court rejected a defendant's challenge that the person signing the letter was not an authorized individual. "[U]naware of any authority requiring the official authorizing the application to personally sign the letter transmitted to the U.S. Attorney's Office," the court concluded it was enough that the application was signed on behalf of an authorized official. *Id.* The court agrees with this reasoning and finds no grounds here to question whether the application was properly authorized simply because the application was signed on behalf of the authorizing individual.[1]

## NECESSITY REQUIREMENT

Title III requires that an application for a wiretap order contain "a full and com-

---

1. " '[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption.' " *United States v. Castillo–Garcia*, 117 F.3d 1179, 1186 (10th Cir.) (quoting *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995)), *cert. denied*, 522 U.S. 962, 118 S.Ct. 395 (1997).

plete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The authorizing judge must make a concomitant finding on necessity. 18 U.S.C. § 2518(3)(c). "The 'necessity' requirement of Title III is not an 'exhaustion' requirement," for law enforcement officers " 'are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping.' " *United States v. Castillo–Garcia*, 117 F.3d 1179, 1187 (10th Cir.) (quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir.1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2497 (1996)), *cert. denied*, 522 U.S. 962 (1997). Rather, this requirement "ensure[s] that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *United States v. Edwards*, 69 F.3d at 429 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974)). The government may satisfy the necessity requirement without actually trying other investigative procedures so long as it can prove "that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try." *Castillo–Garcia*, 117 F.3d at 1187 (citations omitted). Suppression of the wiretap evidence is the remedy when an application is granted without meeting the necessity requirement. *Id.* at 1185.

■ The Tenth Circuit in *Castillo–Garcia* laid out the standards required for an application:

To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investi-

gative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous. We add pen registers and trap and trace devices to this list because they possess a logical relationship and close affinity to wiretaps and yet are less intrusive. Thus, unless the government can show that they would be ineffective or dangerous they must be tried before resorting to wiretaps.

. . . .

[G]eneralities, or statements in conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap. . . .

However, the government need not exhaust or explain its failure to exhaust every *conceivable* investigative procedure before resorting to wiretapping. [*United States v.*] *Mesa–Rincon*, 911 F.2d [1433] at 1444 [(10th Cir.1990)] (citing *United States v. Apodaca*, 820 F.2d 348, 350 (10th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987)). Instead, we require the government to "prove exhaustion—either by attempt or explanation of

why the method would not work—of all 'reasonable' investigatory methods." *Id.* 117 F.3d at 1187–88. The court further said that it is unnecessary for the government to address each category formally if "the government's stated explanation for its use, or failure to use, normal investigative techniques clearly encompasses each of these categories and any other" applicable and "normal investigative technique." 117 F.3d at 1188. Nor is it fatal if the government's application overlooks discussing one or more specified categories so long as "it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." *Id.* at 1188. Tempering all of these propositions is the Tenth Circuit's adherence "to Congress's intention that the government's demonstration of the necessity for instituting a wiretap be evaluated in a practical and commonsense fashion." *Id.* at 1187 n. 5. The court looks to all facts and circumstances in deciding whether the government's showing of necessity is sufficient. *Id.* at 1187.

■ With these standards in mind, we analyze the applications for the wiretaps at issue in this case. There are eight applications at issue.[2] In *Castillo–Garcia,* the court evaluated each application for whether it "contained a full and complete statement demonstrating that" the normal investigative techniques were tried and failed or "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 117 F.3d at 1188 (quotation and citation omitted). The defendant Michael Hopkins raises a necessity challenges as to the applications on Wrights' residential telephone (Line A), and the defendant Tim Cline's necessity challenge appears to be made against all of the applications. As the defendant Cline recognizes, the different applications are nearly identical as to averments on "necessity" with the only differences being that later applications are supplemented with a few factual statements. This similarity is to be expected considering that six of the eight applications concern telephone lines known to be used principally by Johnny Shane Wright and/or his wife. The other two applications lines are for telephone lines used and subscribed to Tim Cline and/or his business. These latter applications for Cline's telephones are part of the same on-going investigation into Wright and his network for manufacturing and distributing methamphetamine. Rather than lengthen this order by repeating its discussion as to each of the eight applications, the court will address them as a group other than to note certain statements made with respect to the defendant Cline in the applications for Lines D and E.

(1) Surveillance The affidavits supporting the wiretaps stated that surveillance had been conducted on numerous occasions on those suspects believed to be the manufacturers and distributors of methamphetamine. Surveillance has met with limited success because of several circumstances. First, the suspects are long-time residents who live and operate their drug conspiracy in a rural area. Officers and their vehicles are "visibly conspicuous" to the suspects thus compromising any efforts at sustained surveillance. Second, the suspects are known to employ counter-surveillance measures, including surveillance cameras, monitors, night-vision equipment, police

2. There are three applications for the three monitoring periods on Wrights' residence (Line A); one application for cell telephone subscribed to Miste Alartosky (Line B); two applications for cell telephone subscribed to Johnny Wright (Line C); one application for the business telephone at Biker's Dream (Line D); and one application for the Clines' residence telephone (Line E).

scanners, radio transmitters, and roving patrols of neighbors and co-conspirators. On one occasion when officers were driving in the vicinity of Johnny Shane Wright's residence, a vehicle began following them and someone in that vehicle appeared to write down their license tag number. Tim Cline also lives in a rural area with other members of the Loners Motorcycle Gang living nearby. Surveillance of Cline's businesses is complicated by suspects who are also local business members or county employees. Due to these counter-surveillance measures and these other circumstances, increased surveillance carries a serious risk of being detected and of danger to the surveillance agents. Third, officers' efforts at following suspects' vehicles are detected quickly, as the suspects frequently travel on rural gravel roads not frequently used by others. Fourth, further surveillance is not likely to lead to sufficient evidence, because dealers in large drug quantities tend to be "extremely vigilant" of law enforcement and this is particularly true of those who use methamphetamine which frequently causes paranoid behavior. Finally, surveillance has been ineffective in identifying all members of the conspiracy, the sources of the different ingredients needed to manufacture the methamphetamine, the persons receiving the distributed product, and the location and nature of the illegal drug proceeds.

In light of the above statements, it appears that the officers have attempted to investigate the different targets through traditional surveillance techniques and that further surveillance efforts would likely be unsuccessful. The rural areas, the involvement of neighbors and nearby friends native to the area, and the counter-surveillance measures are unique factors that clearly impede sustained and effective surveillance techniques. As described in the supporting affidavit, it did appear that Wright and Cline conducted their methamphetamine business via the different telephone lines, thus limiting the effectiveness of less intrusive methods of investigation. While the use of telephones to conduct criminal activity does not necessarily warrant a wiretap, in this case, evidence against the inner circle of suppliers, manufacturers and distributers could not have reasonably been obtained from traditional forms of surveillance.

## (1) Questioning and Interrogation of Witnesses and Participants

The supporting affidavits indicate that certain cooperating individuals were interviewed prior to seeking these wiretaps, but that further use of this investigative technique would not be effective to reveal the full scope of the conspiracy. Some witnesses have provided confidential information but are unwilling to testify out of personal safety concerns. Many of the suspects identified in this investigation have criminal histories that include violent behavior. Individuals involved in this organization believe two or three murders are tied to this organization's drug activity. One of the cooperating individuals refused to discuss any information about the motorcycle gang out of concern that anyone suspected of being an informant would be killed. Finally, the affidavits assert that interviews of other witnesses or the use of the grand jury to compel witnesses to testify would result only in denials of involvement and in other co-conspirators being alerted of the investigation and, thus, compromising the scope and effectiveness of the investigation.

In the context of this investigation, these averred statements establish that the law enforcement officers reasonably attempted to use witness and participant testimony to gather evidence against the suspects. Because of the nature of the conspiracy and the violent tendencies of the suspects, these interviews did not enable the officers

to identify the full scope of the conspiracy. Use of the grand jury would likely have resulted in personal denials and alerted co-conspirators. As discussed under later sections, officers have made full use of the cooperating individuals available to them but have been unsuccessful at obtaining anymore persons interested in cooperating with them. The affidavit shows these traditional techniques were not sufficient to fully disclose the details needed to prosecute this conspiracy.

**(2) Search Warrants**

The affidavits mention that search warrants have been used successfully to seize drugs, methamphetamine laboratories and narcotics proceeds, but this technique has not revealed the scope of the organization and has not satisfied the other objectives of this investigation. The affidavits specifically state that this investigative technique has not fully identified the sources of chemicals and precursors, methods of distribution, nor other members of the conspiracy. It is also averred that additional search warrants alone will not provide evidence of the complete distribution network in the three state area and possible other areas throughout the United States. Those affidavits referring to Tim Cline discuss that prior search warrants executed on Cline's residence and business provided no direct evidence of Cline's suspected drug trafficking activities even though officers documented more then $500,000 of unexplained income.

The affidavits sufficiently explain why search warrants would not provide officers with a full investigation into the scope, objectives, members, distribution methods, and chemical sources of the conspiracy. Where an investigation, like here, targets the upper echelon of the conspiracy and seeks to learn the sources for different precursors and distribution points, additional search warrants are not likely to be effective. *See United States v. Garcia*, 232 F.3d at 1314.

**(3) Infiltration and Use of Informants/Undercover Agents**

The affidavits clearly set forth the somewhat successful use of at least three cooperating individuals, the unsuccessful efforts made to infiltrate an undercover agent in the conspiracy, and the successful purchase of pseudoephedrine by undercover agents. Having lived in the same area and known each other for many years, Wright and his co-conspirators rarely allow others into their organization's "inner circle." The affidavits disclose that the investigation gained important information from three cooperating individuals and/or sources but that these three persons could no longer be used in the investigation to gain additional evidence needed for the prosecution. Despite extensive contact with a co-conspirator who was now incarcerated, the first cooperating individual was suspected of being an informant by Wright and the others and had been cut off from most members of the organization completely. The second cooperating individual is no longer available to the investigation because he/she was recently incarcerated for unrelated criminal conduct. This individual attempted to arrange for an undercover agent to deal directly with Johnny Shane Wright, but Wright subsequently refused any contact with the undercover agent. The third cooperating individual terminated his cooperation with the government and actively returned to working for the drug conspiracy. Due to the size and nature of the conspiracy as well as the suspicious attitude displayed by key players, the affiant averred that it was highly unlikely if not impossible for an undercover officer to infiltrate the upper levels of this drug conspiracy and identify all members of the conspiracy and their roles and learn the manner in which the conspiracy launders its illegal proceeds.

The first two cooperating individuals had no direct knowledge of Tim Cline, and the third individual alluded to some knowledge of the motorcycle gang but refused to divulge his information out of fear for his safety. While undercover officers had successfully purchased pseudoephedrine from a business related to Tim Cline, this work revealed nothing about the scope and extent of the conspiracy other than its lowest-level distributors. The affidavits set out that Cline is like Wright in "dealing only with trusted members of his organization" and that "members of organized 'outlaw' motorcycle gangs are very paranoid and protective or (sic) their organizations and activities." The loyalty of new individuals is often the subject of testing over lengthy periods of time.

From the averments found in the applications, the court agrees that further use of informants and undercover agents would likely prove ineffective in discovering the full scope of the conspiracy. The organization is plainly a "close" one that is extremely cautious about letting in new people. The knowledge of the confidential sources was limited, and their ability and willingness to assist was missing. The court concludes that officers did make reasonable attempts at operating undercover and using informants, but that further use of these techniques or attempts to infiltrate the organization would be ineffective and potentially dangerous.

### (4) Review of Telephone Records and Pen Register Results

The affidavit reveals the investigation employed pen registers that indicate the telephones to be tapped were frequently used to contact telephone numbers subscribed by known participants in the conspiracy. Such information, however, does not disclose the identities of those involved in those conversations, the substance of those conversations, or the nature or scope of any criminal activity being discussed. This data does indicate that Cline and Wright used the telephone to contact other suspected members of the conspiracy. The fact of these contacts occurring is insufficient by itself to complete the investigation into this suspected widespread conspiracy.

In sum, it appears from the affidavits that law enforcement officers did attempt all five categories of traditional investigative techniques before seeking the wiretaps. The defendants contend, however, that the affidavits do so only in a "highly conclusory fashion" and otherwise lack any factual statements that specifically relate to certain individuals targeted by the wiretap. The affidavits do set forth a sufficiently complete statement of other investigative techniques actually used or considered by law enforcement officers. The affidavits contain factual statements that are specifically related to the individuals targeted by the wiretap.[3] When

---

**3.** The defendant Tim Cline maintains there are no factual statements of necessity specifically related to him. As outlined in the affidavit, law enforcement officers had gained information from a confidential source that Wright obtained most of the pseudoephedrine pills for his methamphetamine manufacturing from Tim Cline, the owner of Biker's Dream; that Wright traded methamphetamine for the pseudoephedrine pills from Cline; that Wright sold large quantities of methamphetamine to the Loners Motorcycle Gang from Quapaw, Oklahoma; and that Cline was a member and president of this motorcycle gang. (Dk. 628, Ex. 4, Affid. of Agent Robert Ryan, ¶¶ 42 and 43). The pen register records from Wright's residential telephone showed telephone calls to Biker's Dream and Tim Cline's residence. The affidavit lays out Tim Cline's suspected significant role in the upper level of this conspiracy. The affidavit's remaining statements of fact going to efforts at investigating this level of the conspiracy pertain to Tim Cline as well as to the other members intimately involved in the conspiracy.

placed in the context of the whole affidavit, the broader statements are not wholly conclusory and would not apply to every member of every suspected drug conspiracy. The affidavit adequately explains how the factual circumstances unique to this case, *i.e.*, the rural area, the small surrounding communities, the extended use of counter-surveillance techniques, the frustrated efforts at using cooperating individuals and undercover agents and the close-knit group of conspirators, significantly restricted the government's ability to make effective use of alternative investigative techniques.

The defendants complain that the necessity language appearing with earlier applications is substantially similar to that used in later applications and in requests for extensions, that any additional allegations are mere boilerplate, and that subsequent applications give no descriptions of new or additional investigative techniques tried or considered after the initial wire tap. "Although we have held that the government may not 'move swiftly from wiretap to wiretap,' *Castillo–Garcia*, 117 F.3d at 1196, the government is not necessarily under an obligation to repeat these forms of investigation between each wiretap." *United States v. Garcia*, 232 F.3d at 1315. Instead, the government need only " 'consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap.' " *Id.*

The affidavits here reflect that before seeking extensions and new wiretaps the government did consider whether normal investigative procedures would be effective in obtaining the needed evidence in light of evidence obtained from prior wiretaps. The intercepted conversations confirmed Wright's extensive use of counter-surveillance techniques, Wright's control over members of the organization, Wright's paranoia about law enforcement surveillance, Wright's ongoing use of the rural setting to avoid detection of his operations, and Wright's efforts to gather information about persons who might be a threat to his organization. In short, though many of the facts in later affidavits are the same as those found in Agent Ryan's first affidavit, it is apparent that the scope, focus and nature of the investigation had not changed during the intervening time periods. In fact, later affidavits repeatedly state that the relevant circumstances and facts have not changed from those laid out in the first affidavit. Law enforcement was still having difficulty securing evidence on which to prosecute the manufacturer, suppliers, and wholesale distributors.[4] The unavailable status of the previous three cooperating individuals had not changed, and there had been no new opportunities for introducing undercover agents. For that matter, there were no changes with the inadequacy of pen register records and the risks with witness interviews and search warrants. The problems with surveillance persisted, though officers had some success in observing after the traffic stop and seizure of pseudoephedrine tablets from Cline's pickup that Wright did visit Cline at Biker's Dream later on the same day. The more important evidence came even later when Wright in a telephone call with his wife alluded to his meeting with Cline and to some of the topics that had been discussed.

Collecting necessary information about the highest level participants in the conspiracy remained the difficult goal of the

4. An intercepted conversation between Tim Cline and Wright led to a traffic stop that provided evidence of Cline's role as a pseudoephedrine supplier for Wright. The government still lacked evidence regarding Cline's source(s), Cline's proceeds, and Cline's distribution network.

investigation, and traditional investigative techniques simply had not worked and held little likelihood of providing the evidence needed for a criminal prosecution of these participants. Thus, the preceding wiretaps did not obviate the need for extensions or additional wiretaps, nor were there changed circumstances or new events indicating that traditional investigative techniques should be tried again. Guided by common sense, the court finds that the wiretaps employed here were necessary under these circumstances. The affidavits sufficiently explained both how law enforcement officers had attempted traditional investigative procedures and how their further reliance on these means would not be productive and could likely be counterproductive. The court is satisfied that the wiretaps here were necessary to reveal the full scope of the conspiracy and distribution network; to identify the upper level participants, manufacturers, suppliers and wholesale distributors; and to learn the location of proceeds and sources of chemical supplies.

## SEALING OF THE WIRETAP TAPES

■ Section 2518(8)(a) of Title 18 provides in relevant part:

The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication

or evidence derived therefrom under subsection (3) of section 2517.

This section plainly imposes as a prerequisite to admissibility that "either the recording must have been properly placed under seal, or the government must provide a 'satisfactory explanation' for its failure to comply with the sealing requirement." *United States v. Gomez,* 67 F.3d 1515, 1523 (10th Cir.1995) (citing *United States v. Ojeda Rios,* 495 U.S. 257, 263, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990)), *cert. denied,* 516 U.S. 1060, 116 S.Ct. 737 (1996). "[T]he seal required by § 2518(8)(a) is not just any seal but a seal that been obtained *immediately* upon expiration of the underlying surveillance order." *Ojeda Rios,* 495 U.S. at 263, 110 S.Ct. 1845. "[T]he purpose of sealing, ... is to ensure that 'subsequent to its placement on a tape, the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded.'" *Gomez,* 67 F.3d at 1524 (quoting *Ojeda Rios,* 495 U.S. at 263, 110 S.Ct. 1845). For not complying with this statutory requirement, the sanction "is suppression of the recording and evidence derived therefrom." *Id.* at 1523.

The Third Circuit has construed "immediately" in § 2518(8)(a) to mean "as soon as practical after the surveillance ends." *United States v. Williams,* 124 F.3d 411, 429 (3rd Cir.1997), *cert. denied,* 522 U.S. 1051, 118 S.Ct. 698, 139 L.Ed.2d 642 (1998). The Sixth, Ninth and Second Circuits have said they understand "immediately" to mean "within one or two days." *United States v. Wilkinson,* 53 F.3d 757, 759 (6th Cir.1995) (quoting *United States v. Pedroni,* 958 F.2d 262, 265 (9th Cir. 1992)); *United States v. Wong,* 40 F.3d 1347, 1375 (2nd Cir.1994), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1968 (1995). The Third Circuit has held that tapes were sealed immediately when the delay was only five or six days after counting an

intervening weekend. *United States v. Williams*, 124 F.3d at 429 (citing *United States v. Carson*, 969 F.2d 1480, 1488 (3rd Cir.1992)). The inquiry is over if the tapes were sealed as soon as practical, but the inquiry turns to whether the government's explanation is satisfactory when the tapes "were not sealed promptly enough." *Id.* (citing *United States v. Carson*, 969 F.2d at 1491)

"The statute requires a *satisfactory* explanation, not just an explanation." *Ojeda Rios*, 495 U.S. at 264, 110 S.Ct. 1845. "A *satisfactory* explanation is one that is 'objectively reasonable.'" *United States v. Jackson*, 207 F.3d 910, 916 (7th Cir.2000) (quoting in part *Ojeda Rios*, 495 U.S. at 266–67, 110 S.Ct. 1845), *judgment vacated on other grounds*, 121 S.Ct. 376 (2000). The government cannot substitute this requirement with "proof of nontampering." *Ojeda Rios*, 495 U.S. at 264–65, 110 S.Ct. 1845. Rather, the government must "explain not only why a delay occurred but also why it is excusable." *Id.* at 265, 110 S.Ct. 1845. "[T]he government 'must prove the *actual reason* for the sealing delay rather than an *excuse* for some ulterior purpose or administrative bungle.'" *United States v. Quintero*, 38 F.3d 1317, 1326–27 (3rd Cir.1994) (quoting *United States v. Vastola*, 989 F.2d 1318, 1323 (3rd Cir.1993)), *cert. denied*, 513 U.S. 1195, 115 S.Ct. 1263 (1995).

Some circuits have recognized that the supervising or issuing judge's absence or unavailability may be a satisfactory explanation for delay in sealing. *See, e.g., United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir.) ("Intervening weekends, holidays, and the unavailability of the issuing judge are satisfactory explanations for slight delays [7 days] in presenting wiretap recordings for sealing.") (citing in part *United States v. Ardito*, 782 F.2d 358, 362–63 (2nd Cir.) ("two-day intervening holiday, unavailability of issuing judge, and

need to prepare paperwork provided adequate explanation for five-day delay"), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986)), *cert. denied*, 513 U.S. 1031, 115 S.Ct. 610 (1994); *United States v. Pedroni*, 958 F.2d 262, 266 (9th Cir. 1992) ("The unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay.") (citing in part *United States v. Fury*, 554 F.2d 522, 533 (2nd Cir.1977) (six-day delay reasonably explained by unavailability of issuing judge who was on vacation), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978)); *cf. United States v. Williams*, 124 F.3d at 430 (the absence of the issuing judge caused the government to obtain a substitute judge, and the government reasonably relied on the substitute judge's decision to wait until after the weekend to seal the tapes); *but see United States v. Rodriguez*, 786 F.2d 472, 477–78 (2nd Cir.1986) (absence of issuing judge is no longer an acceptable explanation for delay because government should know from circuit precedent that the tapes can be sealed by a judge other than the issuing judge).

The government's explanation is that the delay in sealing is solely explained by the issuing judge's unavailability. As evidenced by his written report and affidavit, SA Ryan states that after he terminated the wiretap at the Clines' residence he immediately prepared the tapes for sealing and informed Allen Litchfield, the Assistant United States Attorney ("AUSA") assigned to this investigation, that the tapes were available for the issuing judge, U.S. District Judge Sven Eric Holmes, to review and seal. Litchfield then advised Judge Holmes of the same and reported back to SA Ryan that the first available date for Judge Holmes to receive the tapes and seal them was March 30, 2000. Following AUSA Litchfield's instructions, SA Ryan delivered the tapes to Judge Holmes

on March 30, 2000, who then examined the tapes and had the tapes sealed in his presence. Ryan avers that the tapes were first sealed by the original monitors and that after March 23, 2000, when he prepared the sealed tapes for submittal to Judge Holmes, he kept sole custody of them in a locked drop box in a secure facility at the DEA Resident Office in Springfield, Missouri.

Section 2518(8)(a) requires the recordings to be sealed under the directions of the issuing judge. It is objectively reasonable for the government in this circuit to rely on the plain wording of this provision in making the tapes available to the *issuing* judge, as the judge's schedule reasonably permits, and in having them sealed pursuant to that judge's directions. The Tenth Circuit has given no indication that an issuing judge's schedule is an unacceptable reason for sealing delay. The court here has no basis for questioning the government's good faith in abiding by the delay caused by the judge's schedule. Indeed, the government took reasonable precautions to secure the recordings during the brief period of delay and then presented them to the issuing judge on the first day he had available. There is nothing of record to suggest that the delay of seven days unfairly prejudiced the defendants or provided any tactical benefit to the prosecution. Consequently, the court believes the government has carried its burden here of coming forward with a satisfactory explanation.

The court concurs with the government that an evidentiary hearing on this issue is unnecessary. The affidavit and report of SA Ryan establish that the issuing judge's schedule was the actual reason for the delay. In his report prepared on March 30, 2000, SA Ryan outlined the same circumstances and chronology of events subsequently discussed in his affidavit as the reasons for the delay in sealing. The rec-

ord gives the court no grounds for doubting that the judge's schedule was the "actual" reason for the delay here. In light of the detailed presentation found in the report and affidavit of SA Ryan and the lack of any genuinely contested issues of fact, the court denies the defendant's motion without an evidentiary hearing.

## SERVICE OF LINE E INVENTORY ON TIM CLINE

■ Mentioned briefly in his motion but not argued in or supported by his memorandum, this issue raised by defendant Tim Cline is that he was not served with an inventory from the wiretap on his residence as required by 18 U.S.C. § 2518(8)(d). The government responds in its memorandum attaching documentation that it represents as showing the defendant received an inventory by certified mail. In his reply brief, the defendant does not respond or otherwise dispute the government's documents or the representations based on them.

The government also points out that suppression of the fruits of the wiretap is not an appropriate remedy for the defendant Cline's conclusory argument. A violation of § 2518(8)(d) does not warrant suppression absent a clear showing of prejudice to the defendant. *United States v. Donovan,* 429 U.S. 413, 428, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Savaiano,* 843 F.2d 1280, 1291 (10th Cir.), *cert. denied,* 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988); *United States v. Crumpton,* 54 F.Supp.2d 986, 1012 (D.Colo.1999). "[F]iling an inventory within the 90 day time limit provided by 18 U.S.C. § 2518(8)(d) is a ministerial act 'and failure of strict compliance does not require suppression except upon affirmative showing of prejudice.'" *Savaiano,* 843 F.2d at 1291 (quoting *United States v. Smith,* 463 F.2d 710, 711 (10th Cir.1972))

(*Donovan* suggests "that technical violations of the inventory rule do not constitute unlawful interceptions ...; and, that prejudice to the defendant should be the test."). The defendant here claims no prejudice, and the record suggests none. The court denies the defendant all relief on this summary argument.

## MINIMIZATION REQUIREMENT

 Title III requires that the authorizing judicial orders contain certain provisions, including a requirement that the government minimize the interception of communications unrelated to the illegal activity specified in the application. *See* 18 U.S.C. § 2518(5); *United States v. Killingsworth,* 117 F.3d 1159, 1162 (10th Cir.), *cert. denied,* 522 U.S. 961, 118 S.Ct. 393, 139 L.Ed.2d 307 (1997). This requirement does not mean the government must eliminate altogether the interception of nonpertinent calls. *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). "The Supreme Court has held that this provision does not create an 'inflexible rule of law,' but rather demands an evaluation of the 'facts and circumstances of each case.'" *United States v. Killingsworth,* 117 F.3d at 1165 (quoting *Scott v. United States,* 436 U.S. at 139–40, 98 S.Ct. 1717). The "[d]etermination of proper minimization is analyzed under a reasonableness standard." *United States v. Earls,* 42 F.3d 1321, 1325 (10th Cir.1994) (citing *Scott v. United States,* 436 U.S. at 137, 139–40, 98 S.Ct. 1717), *cert. denied,* 514 U.S. 1085, 115 S.Ct. 1800 (1995). Specifically, the court examines "the reasonableness of the agents' efforts to refrain from monitoring conversations deemed nonpertinent to the investigation." *United States v. Willis,* 890 F.2d 1099, 1101 (10th Cir.1989).

The reasonableness of officers' efforts is evaluated with several general rules in mind. "[P]ertinent calls and misdialed calls" need not be minimized. *Id.* at 1102.

As emphasized in *Scott,* it is important to consider the "'circumstances of the wiretap' at issue rather than the absolute percentage of irrelevant calls intercepted." *Killingsworth,* 117 F.3d at 1165 (quoting *Scott,* 436 U.S. at 139–40, 98 S.Ct. 1717). Consequently, "[t]he interception of nonpertinent calls does not automatically indicate a failure to meet the minimization requirement." *United States v. Earls,* 42 F.3d at 1325 (citation omitted). "When the investigation involves a widespread conspiracy, 'more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.'" *Earls,* 42 F.3d at 1325 (quoting *Scott,* 436 U.S. at 140, 98 S.Ct. 1717). The Supreme Court also has recognized "that officers should be given some leeway at the early stages of investigation where it is difficult to determine which calls are relevant and which are irrelevant." *Killingsworth,* 117 F.3d at 1166 (citing *Scott,* 436 U.S. at 141, 98 S.Ct. 1717). The interception of the first two to three minutes of nonpertinent calls may be proper, particularly during the early period of the investigation when agents are trying "to determine identity of speakers and significance of conversations." *Willis,* 890 F.2d at 1102; *see Earls,* 42 F.3d at 1325. For that matter, short calls lasting less than two minutes are generally not scrutinized for minimization. *United States v. Pichardo,* No. 97–CR–233, 1999 WL 649020, at *5 (S.D.N.Y. Aug. 25, 1999) (citing in part *United States v. Capra,* 501 F.2d 267, 275 (2nd Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975)); *see United States v. Apodaca,* 820 F.2d 348, 350 n. 3 (10th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987).

The Tenth Circuit in *Willis* articulated the procedure for evaluating the reasonableness of officers' efforts at minimization. The government first must make a prima facie showing of reasonable mini-

mization. If the showing is made, the burden then "shifts to the defendant to show more effective minimization could have taken place." 890 F.2d at 1102. Courts apply a similar burden shifting procedure in deciding whether an evidentiary hearing is necessary: "[w]here the government makes a prima facie showing of compliance with the statute, and defendant fails to overcome that showing by demonstrating 'that a substantial number of non-pertinent conversations [have] been intercepted unreasonably,' courts generally will deny a minimization hearing." *United States v. Pichardo*, 1999 WL 649020, at *5 (quoting *United States v. Cirillo*, 499 F.2d 872, 881 (2nd Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974)); *see United States v. Parks*, No. 95–CR–510, 1997 WL 136761, at *16 (N.D.Ill. Mar. 24, 1997) (citing *United States v. Angiulo*, 847 F.2d 956, 980 (1st Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Giacalone*, 853 F.2d 470, 482–83 (6th Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988)), *aff'd*, 207 F.3d 910 (7th Cir.2000), *judgment vacated on other grounds*, 531 U.S. 953, 121 S.Ct. 376, 148 L.Ed.2d 290 (2000)

*General Minimization Inquiry*

The first perspective of this analysis is the officers' general minimization effort. *Willis*, 890 F.2d at 1101. The affidavits reference the statutory requirement for minimization and the plan for instructing monitoring agents about this requirement. The government submits copies of the detailed instructions that remained in the monitored room and were given to each monitoring agent for reading. Prior to conducting any monitoring activities, the agents were required to read each page of the instructions and signify in writing that it had been read. Considering the comprehensive nature of these instructions and the method used for imparting them to the monitoring agents, the government

has made a prima facie showing that the agents received proper training on the minimization of non-pertinent conversations.

In Attachment I to its response, the government summarizes the relevant minimization data for the five lines. The data shows that a total of 4,864 calls were intercepted and that 698 or 14.4% of those calls were minimized. After excluding pertinent calls, mis-dialed calls, and all calls lasting two minutes or less, the total number of intercepted calls was 484 with 317 or 65.5% of them being minimized. These statistics squarely fall within the bounds of reasonableness. *See, e.g., United States v. Willis*, 890 F.2d at 1102 (70% minimization effort was reasonable); *United States v. Crumpton*, 54 F.Supp.2d at 1010 (67% to 92% minimization rate was reasonable under the circumstances).

The defendant Cline takes issue with these statistics. The defendant accuses the government of subsequently reclassifying at least 130 calls to "drug pertinent" on the government's minimization report which had been originally marked as "not relevant" on the agent's monitor log sheets. The defendant also accuses the government of double counting when pertinent calls were made between two monitored lines. The government responds to both arguments in its surreply memorandum.

Other than showing that reclassification has occurred based on a comparison of the monitor log sheets and the minimization report, the defendant Kline makes no effort to demonstrate that the calls classified on the minimization report as drug pertinent are actually not relevant or evidentiary. Of those 130 reclassified calls, more than two-thirds of them were under two minutes in length and, thus, would not have affected the court's calculations on the rate of minimization for non-pertinent

calls. Obviously, the court is not able to determine conclusively the relevance of an intercepted call simply from reading an agent's summary of the call on the monitor log sheet. Even so, for most of the reclassified calls, the government's reasons for doing so seem apparent after factoring in the time of the call, the substance of the call as summarized, and the persons involved in the call. As agents had been investigating for months a widespread conspiracy to manufacture and distribute methamphetamine and had monitored telephone conversations for several months, it only seems logical that at the end of the investigation when all calls have been intercepted, summarized and analyzed, the government will be in the best position to classify calls as pertinent or not. The logic in this is all the more compelling when some of the agents occasionally monitoring the calls, like some of the agents here, have limited involvement in the investigation and lack a comprehensive understanding of the investigation and suspected criminal activity. Without any meaningful basis for questioning the reasonableness for and the reliability of the government's reclassification of calls, the court summarily rejects this challenge to the statistical evidence.

The defendant Cline cites only two instances where double counting supposedly occurred. Because the first cited instance is a call lasting less than two minutes, it was excluded from those calls used in calculating the rate of minimization for non-pertinent calls. The second instance is a call listed as relevant on both monitor log sheets and listed both times as pertinent on the minimization reports. Because this call was treated as pertinent on all logs and reports, it also was excluded from those calls used to calculate the percentage of non-pertinent calls that were minimized. Therefore, neither cited instance had any impact on the figures considered to be a relevant measure of the officers' efforts at minimization. Moreover, the defendant cites no authority for the proposition that double counting occurs when a call between monitored lines is counted as a separate pertinent call on each line. The fact remains that the call was counted as a call on each line and also was characterized properly on each line. The defendant does not explain how this procedure distorts the significance or meaning of the statistics being considered here. The court also rejects this challenge to the statistical evidence.

*Minimization Inquiry as to Specific Defendants*

■ The court now turns the inquiry "to minimization as it relates specifically to defendant[s]." *United States v. Willis,* 890 F.2d at 1102. The question is whether the officers' efforts were reasonable despite their failure to minimize certain non-pertinent calls. The defendant Hibbard complains that none of her calls to the Wright's residence were minimized and, more specifically, that neither of her two calls on November 23, 1999, were minimized. Both of these calls were intercepted on just the second day of monitoring of the Wright's residential line. As the government explains, both calls were eventually classified as "drug-pertinent." The first conversation involved Tracey Wright telling Rhonda Hibbard that "Shane was needing" for Hibbard to get him "some stuff" like the stuff she "gave him the other day" which came "in the glass bottles." In the second conversation that day, Hibbard told Tracey Wright that fear of being seen by a security guard had kept her from going to the far building but that she still "had some solution" which she referred to as "[t]he eyedrops." She also made arrangements with Shane Wright for him to meet her that same evening and pick up these "eyedrops" from her. The officers' failure to minimize either of these

conversations is hardly unreasonable considering that the interception occurred early during the investigation, that the participants appeared to be disguising their intentions with ambiguous references and code words, that the conversations were interspersed with innocuous topics, and that both conversations turned out to be incriminating when combined with statements obtained from cooperating individuals. Indeed, the pattern created by these first two calls between Hibbard and the Wrights justified the officers in monitoring the entirety of subsequent phone calls between these same participants. The defendant Hibbard makes no showing how more effective minimization could have taken place here. For these reasons, the court denies the defendant Hibbard's motion.

■ In arguing that the government failed to minimize numerous conversations of his, the defendant Tim Cline cites twelve conversations (or five percent of the telephone calls over two minutes) intercepted on the business telephone for Biker's Dream—Line D and thirteen conversations (or nineteen percent of the telephone calls over two minutes) intercepted on the residential telephone of Timothy and Janet Cline—Line E. Seven of the twelve cited conversations on Line D were intercepted during the first three days of the wiretap, and all but one of the calls were intercepted during the first two weeks. As for Line E, five of the thirteen cited conversations were intercepted during the first three days of the wiretap, and all but three of the calls were intercepted during the first two weeks. Monitoring officers are due more deference during the early stages of the wiretap as they have yet to identify all relevant voices and to determine the scope of the conspiracy, thus making it difficult to discern between pertinent and non-pertinent conversations. *United States v. Killingsworth*, 117 F.3d at 1166.

The government concedes that in hindsight the calls should have been minimized but points to several circumstances that support the reasonableness of the officers' decisions at the time not to minimize. Officers had information that this was a widespread conspiracy and drug distribution network involving motorcycle clubs and that Cline was using his business as front for illegally distributing controlled substances or precursors. Less minimization is reasonable in such an investigation intended to "determine the precise scope of the criminal enterprise." *Scott v. United States*, 436 U.S. at 140, 98 S.Ct. 1717. Because the laundering of drug proceeds was part of the investigation, the officers acted reasonably in monitoring the conversation between Cline and his banker. The non-pertinent business calls that were intercepted do not show the monitoring officers were unreasonably ignoring obvious patterns of innocent conversations based on the parties to the conversation, the timing of the call, or the subject of conversation. It cannot be overlooked that the lines being monitored were in locations that the government reasonably believed were central to the drug distribution conspiracy. Less minimization is reasonable when the telephone "is located in the residence of [or business of] a person who is thought to be the head of a major drug ring." *Scott*, 436 U.S. at 140, 98 S.Ct. 1717.

After carefully considering each of the cited calls and the government's explanations for not minimizing them, the court is satisfied that the government has made a prima facie showing of reasonable minimization. The memoranda and attached exhibits are "sufficiently 'definite, specific, detailed, and non-conjectural to enable the court to conclude the contested issues of fact going to the validity of the search' are not in dispute." *United States v. Parks*, 1997 WL 136761, at *16 (citing *United*

*States v. Mims,* 812 F.2d 1068, 1073–74 (8th Cir.1987); and *United States v. Castillo–Garcia,* 920 F.Supp. 1537, 1552 (D.Colo.1996), *aff'd in part and rev'd in part on other grounds,* 117 F.3d 1179 (10th Cir.), *cert. denied,* 522 U.S. 962, 118 S.Ct. 395, 139 L.Ed.2d 309 (1997)). The defendants have not come forward with a showing that a substantial number of non-pertinent conversations were intercepted unreasonably or that there was a prima facie pattern of insufficient minimization during any of the surveillance periods. Moreover, the defendants have not suggested any alternative procedures that would have improved the minimization of non-pertinent calls and still permitted the government to achieve the lawful objectives of its criminal investigation into this widespread conspiracy to manufacture and distribute methamphetamine. For these reasons, the court denies the defendant Cline's request for an evidentiary hearing and finds that the government made honest, reasonable efforts to limit the interceptions in compliance with Title III's overall minimization requirement. *See United States v. Cox,* 567 F.2d 930, 933 (10th Cir.1977) ("Courts should avoid adopting an overly restrictive interpretation of the minimization requirement which makes it impossible to use this device in connection with the investigation of organized criminal conspiracies."), *cert. denied,* 435 U.S. 1018, 98 S.Ct. 1892, 56 L.Ed.2d 398 (1978). Finally, any violations of the minimization requirement here are not so substantial, intentional or blatant as to warrant the suppression of any calls.

### WIRETAPS ON LINES D AND E AND WIRETAP EXTENSIONS ON LINE A—FRUITS OF AN ILLEGAL SEARCH AND SEIZURE

The defendant Tim Cline argues the wiretap extensions on the Wright residence (Line A) and the wiretaps on Biker's Dream (Line D) and on his residence (Line E) were authorized on applications containing facts derived from an illegal search and seizure. This argument simply adopts the matters presented in the defendant Timothy Cline's pending motion to suppress evidence derived from a traffic stop on December 15, 1999, in Cherokee County, Kansas. (Dk.536). The parties argued that motion and submitted evidence in a hearing conducted on May 22, 2001. The court has taken the motion under advisement and anticipates filing a written order soon. The court will reserve for that order its discussion of these issues and the fruit of the poisonous tree doctrine.

IT IS THEREFORE ORDERED that the defendant Rhonda Hibbard's Motion to Suppress Wiretap Interceptions (Dk.551); the defendant Michael Hopkins' Motion to Suppress Wiretap Evidence (Dk.583); and the defendant Timothy Cline's Motion to Suppress Evidence Derived from Interception of Wire Communications (Dk.618) are denied with the exception of the issue regarding the unlawful search and seizure on December 15, 1999;

IT IS FURTHER ORDERED that the motions filed by the defendants Melissa Bunce, Janet Cline, John Cervine, Ginger Breuil, and Johnny Shane Wright (Dks. 643, 698, 708, 716 and 719) to join these motions to suppress are granted on the conditions expressed in the court's Criminal Procedural Guidelines § I, ¶ F.